[No. A091473. First Dist., Div. Three. Mar. 2, 2001.]

DARREL FRANKLIN et al., Plaintiffs and Respondents, v.
USX CORPORATION, Defendant and Appellant.

COUNSEL

Drath, Clifford, Murphy, Wennerholm & Hagen, John M. Drath, Rick J. Murphy, David F. Beach; Becherer, Kannett & Schweitzer, Patrick J. Becherer; Baughman & Associates, R. Patrick Baughman, Susan S. Henderson, Eileen M. Joyce; and Raymond Bacerdo for Defendant and Appellant.

Kazan, McClain, Edises, Simon & Abrams, Simona A. Farrise, James L. Oberman and Andrea Huston for Plaintiffs and Respondents.

OPINION

**WALKER, J.**—Jeannette Franklin, now deceased, and her husband, Darrel Franklin (respondents),[1] filed an action for personal injury, premises liability and loss of consortium against several defendants, including appellant USX Corporation (USX). Respondents contended that Jeannette had contracted mesothelioma, an asbestos-caused cancer, as a result of childhood exposure to secondhand asbestos carried home by her parents, who worked at the Western Pipe & Steel Shipyard (WPS) in South San Francisco during World War II. Respondents sought to hold USX liable for their injuries on the theory that it was the successor in interest to WPS. By stipulation, the successor in interest issue was tried by the court on a statement of facts that were either agreed to or disputed, along with an agreed-upon documentary record; no testimony was presented in this phase of the trial. The trial court

[1]On November 3, 2000, we granted the application of Darrel Franklin, Deborah J. Carter, Michael D. Franklin and Deanne M. Sharer to substitute in as respondents in place of Mrs. Franklin.

concluded that USX was the successor in interest to WPS, and was therefore liable for any damages caused by WPS. In a bifurcated proceeding, a jury decided the issues of liability and damages, and returned a verdict against USX in excess of $5 million.

USX appeals the trial court's conclusion that it was the successor in interest to WPS. It also appeals the jury verdict on several grounds. We hold that the trial court erred in finding USX liable as the successor in interest to WPS. Accordingly, we do not address the issues pertaining to the jury verdict.

FACTS

*General Background*

Prior to the beginning of World War II, WPS owned a steel fabrication plant in South San Francisco, which had been used to build ships during World War I. When World War II broke out, WPS entered into a contract with the United States Maritime Commission to again build ships for use in the war. The contract required the use of ship building materials containing asbestos.

Jeannette Franklin was a child during World War II. Both of her parents worked at WPS from 1942 to 1945. Neither of her parents worked directly with asbestos-containing materials, but they both worked in areas where asbestos was present. At times, they were exposed to airborne dust during the mixing of mud, during insulation work, and when workers swept up debris. Franklin alleged that she was exposed to this asbestos-containing dust because her parents brought it home on their clothing and in their car. In 1996, Franklin was diagnosed with peritoneal mesotheliama, which she maintained was caused by her childhood secondhand exposure to asbestos.[2]

*Corporate History*

In December 1945, the assets of WPS were purchased by Consolidated Steel Corporation of California (Con Cal) for over $6.2 million in cash. In connection with the sale, Con Cal agreed to assume all of the liabilities, obligations and commitments of WPS.

On December 14, 1946, Con Cal and some of its affiliates entered into an agreement (the purchase agreement) to sell certain assets (the transfer assets)

---

[2]There was a great deal of evidence presented pertaining to the details of asbestos exposure both to Jeannette Franklin's parents and to Franklin, as well as to the nature of her cancer, and the likelihood that she contracted it as a result of childhood exposure to asbestos. We do not detail these facts, as they are primarily relevant to the appeal from the jury verdict, which we do not reach.

to Columbia Steel Company (Columbia), a division of U.S. Steel.[3] Although the closing date was set for March 31, 1947, the filing of a Sherman Act antitrust action delayed the closing until the summer of 1948. In August 1948, Columbia assigned its rights under the purchase agreement to a newly formed corporation and subsidiary of U.S. Steel, Consolidated Western Steel Corporation of Delaware (Con Del). On August 31, 1948, Con Cal sold the transfer assets to Con Del for almost $8.3 million in cash, plus additional consideration that brought the total purchase price to over $17 million. Con Del was later merged into U.S. Steel, which thereafter changed its name to USX, the appellant here.[4] After August 31, 1948, Con Cal changed its name to Consolidated Liquidating Corporation, which dissolved on February 29, 1952. Alden G. Roach was Con Cal's president and chairman of the board at the time of the sale; after the sale he continued as president of Con Del and Columbia, and was appointed chairman of Columbia's board.

### The Trial Court Proceedings

It was agreed by the parties and the court that the issue of successor liability would be decided by the trial court based upon an agreed statement of stipulated and disputed facts and on stipulated exhibits. In a statement of decision issued March 1, 2000, the trial court first found, consistent with the parties' stipulated facts, that in 1945 Con Cal had assumed all of the liabilities of WPS. It further found, on several grounds, that USX was the successor in interest to Con Cal, rendering USX responsible for the liabilities of WPS, including contingent tort liabilities. The court held: (1) that by virtue of its purchase of Con Cal's business, property and assets, USX had expressly or impliedly assumed the liabilities of Con Cal/WPS;[5] (2) that the transaction between USX and Con Cal constituted a de facto merger; (3) that USX was a mere continuation of Con Cal/WPS; and (4) that USX was the product line successor to Con Cal/WPS.

### STANDARD OF REVIEW

 For the most part, the trial court's decision in this case was one of contractual interpretation based upon stipulated facts and exhibits, with no credibility determinations. As to those, we exercise our independent judgment in reviewing the trial court's findings. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].) In addition, the trial court made certain factual findings. As to those, we apply

---

[3]Relevant contract terms are set forth in the appropriate discussions, below.

[4]To avoid confusion, we will hereafter refer to the purchasing party as USX.

[5]In order to avoid excessive wordiness, we will refer to the predecessor as Con Cal/WPS. By this label, we acknowledge that Con Cal assumed the liabilities of WPS in 1945, and that the issue being tried by the court was whether USX would itself assume those liabilities.

the substantial evidence standard of review. (*County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1274 [90 Cal.Rptr.2d 41].)

DISCUSSION

■ It has been generally stated that "where one corporation sells or transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the former unless (1) the purchaser expressly or impliedly agrees to such assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape liability for debts." (*Ortiz v. South Bend Lathe* (1975) 46 Cal.App.3d 842, 846 [120 Cal.Rptr. 556], disapproved on other grounds in *Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 34 [136 Cal.Rptr. 574, 560 P.2d 3] (*Ray v. Alad*).) In addition, under certain limited circumstances an exception has been judicially created to provide a remedy against the successor when a person has been injured by the predecessor's product. This exception, first enunciated in *Ray v. Alad, supra,* 19 Cal.3d 22, has become known as the "product line successor" rule. The trial court found USX liable for respondents' injuries under the first three general exceptions to nonliability, as well as under the product line successor exception. We consider each ground, and hold that USX cannot be found to be the successor in interest to Con Cal/WPS under any of the theories asserted.

*USX Did Not Expressly or Impliedly Assume the Tort Liabilities of Con Cal/WPS*

■ Based upon its interpretation of the purchase agreement and other extrinsic evidence, the trial court found that USX had expressly or impliedly assumed the tort liabilities of Con Cal/WPS. ■ Because no issue of credibility was involved in the trial court's determination, we review the agreement and the extrinsic evidence de novo (*Qualls v. Lake Berryessa Enterprises, Inc.* (1999) 76 Cal.App.4th 1277, 1283 [91 Cal.Rptr.2d 143]) with an eye toward giving effect to the mutual intentions of the contracting parties (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912 [75 Cal.Rptr.2d 573]). ■ We first consider the language of the purchase agreement itself, which we conclude unambiguously shows that USX did not assume the tort liabilities of Con Cal/WPS. (See *Chaknova v. Wilbur-Ellis Co.* (1999) 69 Cal.App.4th 962, 967 [81 Cal.Rptr.2d 871].) We further hold that, because the unambiguous contract was expressly integrated, it was improper to consider extrinsic evidence to vary or alter its terms. (*Id.* at p. 968.)

Finally, even if the extrinsic evidence is taken into account, it does not show the parties' intention that USX assume the liabilities at issue in this action.

Pursuant to the purchase agreement, the bulk of Con Cal's business assets were purchased by USX, with Con Cal retaining certain specified assets and certain existing contracts. With regard to USX's assumption of liabilities, the agreement provided: "The Buyer shall not, except as herein otherwise specifically provided, directly or indirectly, by virtue of any of the provisions of this agreement, become liable for any of the debts, obligations, liabilities, undertakings, agreements or commitments of the Sellers of any nature whatsoever . . . ." It further provided that, while USX would assume responsibility for performing "all the obligations of the Sellers with respect to the uncompleted portion of [assumed] contracts, orders and subcontracts . . . *in no event* shall the Buyer assume any obligations of the Sellers, or any of them, arising out of deliveries of goods, wares or merchandise made by the Sellers prior to the closing, including, but not limited to, any claims on account of any allegedly defective goods, wares or merchandise delivered by the Sellers pursuant to any such contract or order, or otherwise." (Italics added.)

The quoted language is clear and unambiguous; USX assumed only the liabilities specified in the purchase agreement, which did not include the assumption of contingent tort liabilities. It is equally clear that the purchase agreement was an integrated document. It provided that "[t]here are no agreements, contracts, promises, representations or statements between the parties hereto except as contained in this agreement, and this agreement shall constitute the entire and whole contract between the parties hereto."

Notwithstanding the quoted language of the purchase agreement, the trial court found the "contract documents" to be ambiguous, and considered documents extrinsic to the contract in order to resolve the perceived ambiguity. Based upon the purchase agreement provision rendering USX responsible for all unfilled sales orders and on an indemnity clause contained in a document entitled "Bill of Sale" entered into on August 31, 1948, the court found that the agreement between the parties regarding the assumption of liabilities was ambiguous. The indemnity clause in the bill of sale provided that the seller would use its best efforts to obtain written consent from "third parties to all assignments and transfers of leases, contracts, agreements, licenses, options and other property, assets and business assigned and transferred to the respective Buyers . . . in order to make effective as against said third parties any such assignment and transfer, it being understood that, if the respective Buyer shall assume all liabilities thereunder of the Seller to the third party or parties remaining unperformed at the time of such assignment, the Seller will save, defend and keep harmless the respective Buyer of,

from and against such part of such unperformed liabilities as shall relate to the period to and including August 31, 1948."

This indemnity provision was itself clear, and did not render ambiguous the parties' intentions with regard to the assumption of tort liabilities, as it had nothing to do with those liabilities. The subject matter of this indemnity clause pertained only to unfinished contracts assumed by USX in the purchase, and to Con Cal's promise to indemnify USX for those parts of the contracts remaining unperformed before the closing date. While USX agreed to assume responsibility to complete those contracts after the closing date, it specifically disavowed responsibility and liability under the contracts to the extent these arose prior to the closing.

In addition, we note that the bill of sale contained specific and clear provisions relating to the buyer's general nonassumption of liability. It stated that "[t]he transfer of the Seller's business and certain of its property and assets to the Buyers is made without the assumption by the Buyers of any of the liabilities of the Seller except those specifically enumerated below, and the Seller hereby covenants and agrees at all times to save, defend and keep harmless the Buyers . . . from and against any and all claims . . . expenses and liabilities whatsoever, based upon, arising out of or in any way connected with the Seller's liabilities except those specifically enumerated . . . ." Those specifically enumerated exceptions were for liabilities on contracts, purchase orders, unfilled sales orders, performance bonds and indemnity contracts arising *after* August 31, 1948. This provision, as well as the indemnity provision relied upon by the trial court, comport completely with the clear and unambiguous terms of the purchase agreement, by which USX assumed no liabilities for the damages at issue in this lawsuit. We thus conclude that, because the contract language was unambiguous, and the parole evidence created no ambiguity and was consistent with the contract, the trial court erred in considering the extrinsic evidence to vary or modify the terms of the contract. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)

Nonetheless, by referring to extrinsic evidence, the court concluded that USX had, expressly or by implication, assumed liability for the personal injury claims asserted by the Franklins. In reaching its conclusion, the trial court looked to two other categories of extrinsic evidence.

First, it considered letters written by USX to third parties after the execution of the purchase agreement. In these letters, Con Cal's customers,

vendors and subcontractors were informed of the sale of Con Cal's "business and operating properties" to Con Del, and were told that "[t]he change of ownership will not in any way affect the fulfillment of the contractual obligations of the selling company. All undelivered orders and uncompleted contracts of that company will be assumed by the acquiring company and will be performed by it in strict accordance with their terms." In similar letters, various governmental entities were informed of the sale, and advised that Con Del "will continue to operate the transferred facilities and business without material change in present personnel, management or business policies."

The trial court concluded that the "business policies" referred to in these letters "included, among others, Consolidated California's policy to assume WPS' debts and liabilities of any nature." The fundamental problem with this finding is that it finds absolutely no support in the record. These letters speak for themselves: they were written to inform the recipients of the change in ownership, and assure them that the change would have no effect on the fulfillment of the seller's contractual obligations. Based upon the evidence in the record, the letters were not susceptible to the trial court's interpretation.

The court also looked to a Navy contract that USX assumed as part of the purchase agreement. This contract was the one under which WPS had agreed to build ships during the war, resulting in the employment of Jeannette Franklin's parents. The trial court found that the Navy contract imposed on WPS the obligation to maintain and repair the premises at its South San Francisco shipyard, that "all of USX's potential liability in this premises liability case arises out of WPS' operation of the shipyard under this contract, and therefore arises directly out of the fulfillment of this contract that USX specifically assumed," and that "had WPS fulfilled all of its obligations under this contract, Jeannette Franklin's parents likely would not have endured the asbestos exposures at WPS' shipyard that are the subject of this lawsuit against USX." From this analysis, the trial court concluded that USX expressly assumed the tort liabilities of Con Cal/WPS. Again, our review of the document and of the evidence in the record does not support the trial court's conclusion.

The Navy contract in question imposed upon WPS the responsibility to maintain and repair the facilities prior to their transfer to the government. It made no mention of any obligations that could be interpreted as inuring to the benefit of shipyard employees and their safety. Thus, even if considered for the purpose of shedding light on the intent of the parties with respect to assumption of the seller's tort liabilities, the Navy contract contributed

nothing. In addition, there was no evidence in the record to support the trial court's finding that WPS had not fulfilled its obligations under the Navy contract, or that had it done so Jeannette Franklin's parents "likely would not have endured the asbestos exposures."

*There Was No De Facto Merger or Mere Continuation*

██ The trial court also found that USX could be deemed to have assumed the liabilities of Con Cal/WPS under the de facto merger theory and under the theory that USX was a "mere continuation" of Con Cal. Although these two theories have been traditionally considered as separate bases for imposing liability on an successor corporation, we perceive the second to be merely a subset of the first.[6] The crucial factor in determining whether a corporate acquisition constitutes either a de facto merger or a mere continuation is the same: whether adequate cash consideration was paid for the predecessor corporation's assets.

No California case we have found has imposed successor liability for personal injuries on a corporation that paid adequate cash consideration for the predecessor's assets. The trial court recognized this limitation to its holding, but found "no logical reason why the fact that the consideration for a purchase of corporate assets is cash (with an agreement to liquidate) rather than stock should in itself bar victims from recovering from the purchaser for the seller's tortious conduct." ██ We, however, perceive a very sound reason for the rule of nonliability in adequate cash sales: predictability. "Predictability is vital in the corporate field. Unforeseeable alterations in successor liability principles complicate transfers and necessarily increase transaction costs. [Citations.] Major economic decisions, critical to society, are best made in a climate of relative certainty and reasonable predictability. [¶] The imposition of successor liability on a purchasing company long after the transfer of assets defeats the legitimate expectations the parties held during negotiation and sale. Another consequence that must be faced is that few opportunities would exist for the financially troubled company that wishes to cease business but has had its assets devalued by the extension of successor liability." (*Polius v. Clark Equipment Co.* (3d Cir. 1986) 802 F.2d 75, 83.) In addition, of course, a sale for adequate cash consideration ensures that at the time of sale there are adequate means to satisfy any claims made against the predecessor corporation. (See *Ray v. Alad, supra,* 19 Cal.3d at p. 29.)

---

[6]In fact, it appears to us that the mere continuation theory swallows up the de facto merger theory, because once the two mere continuation elements are satisfied there is no need to further consider the additional elements of the de facto merger theory in establishing successor liability.

In reaching its conclusion that the sale of Con Cal's assets to USX constituted a de facto merger, the trial court relied on *Marks v. Minnesota Mining & Manufacturing Co.* (1986) 187 Cal.App.3d 1429 [232 Cal.Rptr. 594] (*Marks*). In *Marks*, the court held that the corporate successor's acquisition of the predecessor's assets *in exchange for stock* constituted a de facto merger, rendering the successor liable for the plaintiff's product liability claim. The *Marks* court set forth five often-quoted factors that indicate whether a purported asset sale is the legal equivalent of a merger: "(1) was the consideration paid for the assets solely stock of the purchaser of its parent; (2) did the purchaser continue the same enterprise after the sale; (3) did the shareholders of the seller become the shareholders of the purchaser; (4) did the seller liquidate; and (5) did the buyer assume the liabilities necessary to carry on the business of the seller?" (*Id.* at p. 1436.) *Marks* held that the transaction before it satisfied all five factors, resulting in a de facto merger. (*Id.* at p. 1438.) In reaching its conclusion, the *Marks* court noted: "The critical fact is that while there was more than one merger or reorganization, an analysis of each transaction discloses to us that its intrinsic structure and nature, *unlike a sale of assets for cash*, was of a type in which the corporate entity was continued and all liability was transferred." (*Ibid.*, italics added.)

*Marks* is not alone in recognizing the overriding significance of the type and adequacy of consideration paid in a corporate asset sale. As our Supreme Court noted in *Ray v. Alad*, the de facto merger exception to the general rule of nonliability "has been invoked where one corporation takes all of another's assets *without providing any consideration* that could be made available to meet claims of the other creditors . . . ." (*Ray v. Alad, supra,* 19 Cal.3d at p. 28, italics added.) And, in *Maloney v. American Pharmaceutical Co.* (1988) 207 Cal.App.3d 282 [255 Cal.Rptr. 1] (*Maloney*), the court held, in the context of the "mere continuation" exception to the rule of successor nonliability, that " '[b]efore one corporation can be said to be a mere continuation or reincarnation of another, it is required that there be insufficient consideration running from the new company to the old.' " (*Id.* at p. 287, quoting *Ortiz v. South Bend Lathe, supra,* 46 Cal.App.3d at p. 847.)

In discussing the mere continuation exception to the general rule of successor nonliability, the court in *Ray v. Alad* stated that liability has been imposed on a successor corporation "only upon a showing of *one or both* of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations. [Citations.]" (*Ray v. Alad, supra,* 19 Cal.3d at p. 29, italics added.) Respondents make much of the

second prong enunciated by *Ray v. Alad*, asserting that the trial court properly found USX to be a mere continuation of Con Cal because Alden Roach was president and a board member of both the predecessor and the successor corporations. However, a review of the cases cited by the *Ray v. Alad* court to support its statement reveals that all of the cases involved the payment of inadequate cash consideration, and some also involved near complete identity of ownership, management or directorship after the transfer. (*Stanford Hotel Co. v. M. Schwind Co.* (1919) 180 Cal. 348 [181 P. 780] [inadequate consideration and 96 percent same ownership]; *Higgins v. Cal. Petroleum etc. Co.* (1898) 122 Cal. 373 [55 P. 155] [inadequate consideration and substantially same ownership]; *Economy Refining & Service Co. v. Royal Nat. Bank of New York* (1971) 20 Cal.App.3d 434 [97 Cal.Rptr. 706, 49 A.L.R.3d 872] [inadequate consideration and substantially same ownership]; *Blank v. Olcovich Shoe Corp.* (1937) 20 Cal.App.2d 456 [67 P.2d 376] [inadequate consideration and full identity of directorate]; *Malone v. Red Top Cab Co.* (1936) 16 Cal.App.2d 268 [60 P.2d 543] [inadequate consideration].) None of these cases involved a situation such as the one before us, where the consideration paid was undisputedly adequate, and only a single person with minimal ownership interest in either entity remained as an officer and director.

Thus, although other factors are relevant to both the de facto merger and mere continuation exceptions, the common denominator, which must be present in order to avoid the general rule of successor nonliability, is the payment of inadequate consideration. The evidence presented showed that in 1948 Con Cal was paid in excess of $17 million for its business assets. As was the case in *Ray v. Alad*, no claim has been made that this consideration was inadequate, or that there were insufficient assets available *at the time of the predecessor's dissolution* to meet the claims of its creditors.[7] (See *Ray v. Alad, supra,* 19 Cal.3d at p. 29.) Lacking the essential factor of inadequate consideration, there was no de facto merger, nor could USX be deemed a mere continuation of Con Cal.

*The Product Line Successor Theory Does Not Apply to Tort Claims*

■ Finally, contrary to established California precedent, the trial court found that pursuant to *Ray v. Alad,* USX was liable as a product line successor in interest to Con Cal/WPS, even though respondents had asserted

---

[7]Respondents and the trial court did not focus on whether assets were available to meet a creditor's claim at the time of dissolution, which is the relevant time frame for evaluating a claim of de facto merger or mere continuation. (*Marks, supra,* 187 Cal.App.3d at p. 1436; *Ray v. Alad, supra,* 19 Cal.3d at p. 29.) Rather, they looked to whether assets were available to satisfy a claim arising some 50 years after dissolution, which is not relevant to the analysis.

no claim for strict product liability. In *Ray v. Alad, supra,* 19 Cal.3d 22, the California Supreme Court imposed liability on Alad Corporation for the plaintiff's injury sustained in a fall from a defective ladder manufactured by Alad Corporation's predecessor. The injury occurred more than six months after Alad Corporation had acquired the assets of the dissolved ladder manufacturer. Although none of the traditional bases for imposing liability on Alad Corporation were present in the plaintiff's action against it for strict product liability, the court held that given the specific circumstances, the plaintiff should recover under a special exception to the general rule. The court explained that " 'the paramount policy to be promoted by the [strict product liability] rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them.' " (*Id.* at p. 31, italics omitted.) It held that imposition of strict liability against the successor to the manufacturer was justified where, as in the case before it, the plaintiff had no viable remedy against the then nonexistent manufacturer of the defective product, the successor to the manufacturer continued to manufacture the same product line as its predecessor, retained the same personnel, used the same designs and customer lists, gave no outward indication of the change in ownership and had opportunities to evaluate production risks and pass on the cost of meeting those risks almost identical to its predecessor's. (*Ibid.*) The *Ray v. Alad* court presented a three-part rationale for imposing strict liability on the successor corporation: "(1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business." (*Ibid.*)

The trial court here found that the *Ray v. Alad* product line successor exception should not be limited to product liability claims, but should extend to ordinary negligence actions. Respondents urge us to reach the same conclusion. In *Monarch Bay II v. Professional Service Industries, Inc.* (1999) 75 Cal.App.4th 1213 [89 Cal.Rptr.2d 778] (*Monarch Bay II*) and *Maloney, supra,* 207 Cal.App.3d 282, this precise argument was presented and rejected. As did those two courts before us, we decline to expand the product line exception beyond the arena of product liability.

We concur with the court's comments in *Monarch Bay II*: "[Appellant] argues there is no significant difference between a plaintiff injured by a defective product and one harmed by corporate negligence and urges us to broaden the *Ray* exception. We agree that in many respects, the distinction is

without a difference. But we see no policy reasons to extend *Ray's* holding beyond strict tort liability. The criticisms levied at the product line exception, which, of course, we are bound to follow under the principles of stare decisis, militate against eroding the traditional rule even further. . . . [¶] The trend in other jurisdictions appears to be away from expansion of successor liability. Although the product line exception was adopted by a number of courts following the *Ray* opinion, 'recent cases from a variety of states have rejected the product line exception in favor of retaining the traditional rule on non-liability.' (Pollak, *Successor Liability in Asset Acquisitions* in Acquiring or Selling the Privately Held Company (Practicing L. Inst. 1998) pp. 77, 99, 101.) [¶] The Ray court clearly intended the product line exception to be limited to the circumstances presented in that case, and we decline to extend the rationale to other circumstances." (*Monarch Bay II, supra,* 75 Cal.App.4th at pp. 1218-1219.)

The court in *Monarch Bay II* also concluded, as we have in the context of de facto mergers, that an imposition of product line successor liability in non-product-liability cases would upset the predictability so vital to key economic decisions made in the corporate milieu. (*Monarch Bay II, supra,* 75 Cal.App.4th at p. 1218.) We, too, view this predictability as crucial. There is no legal basis to support a conclusion that USX was a product line successor liable to respondents for their tort claims.

### CONCLUSION AND DISPOSITION

The trial court found USX liable for the Franklins' injuries allegedly caused by WPS. We conclude that no such successor in interest liability attaches. The fully integrated purchase agreement between the predecessor of USX and Con Cal expressly and unambiguously provided that the buyer was not assuming the seller's liabilities except as specifically provided. The specific assumptions pertained only to business related obligations, and not to the liabilities at issue in this action. Because the purchase agreement was unambiguous and fully integrated, the trial court erred in considering extrinsic evidence to vary or alter the terms of the agreement. Even considering that evidence, however, the agreement was not reasonably susceptible to the court's interpretation. Since respondents have not asserted that the consideration for the sale of Con Cal's assets was inadequate or that there were insufficient assets to satisfy creditors' claims at the time of dissolution, USX was not liable as a successor in interest under the theories of de facto merger or mere continuation. Finally, we conclude that the product line successor rule applies only to product liability actions, and is therefore inapplicable to the present case. Based upon these holdings, we reverse the trial court's determination of the successor in interest issue, and do not address the

remaining issues raised. The judgment entered against USX is reversed. Appellant shall recover its costs on appeal.

Corrigan, Acting P. J., and Parrilli, J., concurred.

A petition for a rehearing was denied March 30, 2001, and respondents' petition for review by the Supreme Court was denied May 23, 2001. Mosk, J., was of the opinion that the petition should be granted.