**ORTHOTEC, LLC, a Delaware Limited Liability Company, Plaintiff,**

v.

**REO SPINELINE, LLC, a West Virginia Limited Liability Company; R & B Medical, Inc., a West Virginia Corporation; Brad Harris, an individual; Eurosurgical S.A., a French Corporation; Mathieu Maassen, an individual; Medistrat, Inc., a Canadian Corporation; Theken Spine, LLC, an Ohio Limited Liability Company, doing business as Theken Surgical, LLC; and Does 1–10, Defendants.**

No. CV 03–8346 DSF JTLX.

United States District Court,
C.D. California.

June 15, 2006.

ORDER GRANTING DEFENDANT THEKEN SPINE, LLC'S AND THEKEN SURGICAL, LLC's MOTION FOR SUMMARY JUDGMENT

FISCHER, District Judge.

## I. INTRODUCTION

This matter is before the Court on the Notice of Motion and Motion of Theken Spine, LLC and Theken Surgical, LLC for Summary Judgment; Memorandum of Points and Authorities in Support of Motion of Theken Spine, LLC for Summary Judgment ("Motion"); [Proposed] Statement of Uncontroverted Facts and Conclusions of Law ("SOUF"); and Compendium of Declarations and Exhibits ("Compendium"), filed on May 10, 2006.

Plaintiff OrthoTec, LLC's Opposition to Theken Spine, LLC's Motion for Summary Judgment ("Opp'n"); Statement of Genuine Issues in Opposition to Defendant Theken Spine, LLC's Motion for Summary Judgment ("SOGI"); and Declaration of Peter W. Ross, were filed on May 25, 2006.

Reply Memorandum in Support of Motion of Defendants Theken Spine, LLC and Theken Surgical, LLC for Summary Judgment ("Reply"); Declaration of Kevin Dorse; Reply Statement of Uncontroverted Facts; and Evidentiary Objections, were filed June 5, 2006.

## II. LEGAL STANDARD

Summary judgment shall be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party need not disprove the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Rather, if the moving party satisfies this burden, the party opposing the motion must set forth specific facts, through affidavits or admissible discovery materials, showing that there exists a genuine issue for trial. *Id.* at 323–24, 106 S.Ct. 2548; Fed.R.Civ.P. 56(e). A non-moving party who bears the burden of proof at trial as to an element essential to its case must make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element of the case or be subject to summary judgment. *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

An issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *See Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.1989). "The mere existence of a scintilla of evi-

dence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury ... could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict ...." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505.

"[A] district court is not entitled to weigh the evidence and resolve disputed underlying factual issues." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir.1992). Rather, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

"[L]egal memoranda and oral argument are not evidence, and they cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion where no dispute otherwise exists." *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978), *cert denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Only admissible evidence can be considered. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir.2002). "Authentication is a 'condition precedent to admissibility,' and this condition is satisfied by 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Id.* (citation and footnotes omitted). The Ninth Circuit has repeatedly held that unauthenticated documents cannot be considered on a motion for summary judgment. *Id.* (citations omitted). "[D]ocuments authenticated through personal knowledge must be 'attached to an affidavit that meets the requirements of [Rule] 56(e) and the affiant must be a person through whom the exhibits could be

admitted into evidence.'" *Id.* at 773–74 (citation and footnote omitted). A proper foundation may be laid by any means permitted by the Federal Rules of Evidence. *Id.* at 774.

"In the absence of a procedural rule or statute, hearsay is inadmissible unless it ... falls within a hearsay exception under Rules 803, 804 or 807." *Orr,* 285 F.3d at 778. Deposition testimony itself is not hearsay when submitted on a summary judgment motion, though the contents of the testimony may be inadmissible hearsay. *Id.* at 779 n. 27.

## III. FACTUAL BACKGROUND

Randy Theken organized Theken Spine, LLC on March 3, 1998 as an Ohio limited liability company under the name Theken Surgical, LLC.[1] (SOUF ¶ 1.) On November 8, 2004, Theken Surgical, LLC amended its articles of organization to change its name to Theken Spine, LLC ("Theken"). (*Id.* at ¶ 2.) Theken Spine, LLC has always been in the business of designing, developing, manufacturing, mechanically testing, and selling medical orthopedic devices, including spinal implants and instruments. (*Id.* at ¶ 3.)[2] Theken's products are used by orthopedic spine surgeons and neurosurgeons to cure, among other things, spinal deformities and diseases. (*Id.* at ¶ 4.) Theken has always sold its products to hospitals and medical offices through independent sales agents and distributors. (*Id.* at ¶ 10.) Theken has approximately 45 employees. (*Id.* at ¶ 6.)

Theken's owners are called "Members." (*Id.* at ¶ 11.) The ownership of Theken is represented by "Membership Units" that are held and owned by each Member. (*Id.* at ¶ 12.) Randy Theken has always owned 90 percent or more of the Membership Units of Theken. (*Id.* at ¶ 13.) No Member of Theken at any time has ever been employed by or otherwise affiliated with REO Spineline, LLC ("REO"). (*Id.* at ¶ 14.) No Member of Theken has ever had any equity or ownership interest in REO. (*Id.* at ¶ 15.) No person affiliated with REO has ever owned any Membership Units of Theken. (*Id.* at ¶ 16.)

From its inception until July 18, 2003, Randy Theken was the Manager of Theken. (*Id.* at ¶ 20.) From July 18, 2003 until October 1, 2005, Theken Orthopaedic, Inc. was the Manager of Theken. (*Id.* at ¶ 21.) From October 1, 2005 until the present, Foxtrot–Papa Management Company, LLC, has been the manager of Theken. (*Id.* at ¶ 22.) Theken Orthopaedic, Inc. and Randy Theken have always been the sole members of Foxtrot–Papa Management Company, LLC, and Randy Theken has always been its sole manager. (*Id.* at ¶ 23.) Randy Theken has always been the sole shareholder, director, and President of Theken Orthopaedic, Inc. (*Id.* at ¶ 23.) Randy Theken has, at all times, exercised the rights and powers of the manager of Theken. (*Id.* at ¶ 25.)

Theken has appreciation rights plans for executive presidents and employees (collectively, "Plans") that can be used to give certain persons "Appreciation Units." (*Id.* at ¶ 26.) Theken established its first appreciation rights plan for employees in 2001. (*Id.* at ¶ 28.) The Plans issued on January 1, 2005 provide: "The purpose of this Plan is to enable the Company to attract and retain the service of Persons of outstanding competence, and to provide an incentive for such key Persons to expand

---

1. The facts in this Order are taken from Defendant's Statement of Uncontroverted Facts ("SOUF"). "Facts" not mentioned here were deemed irrelevant to the determination of the Motion. These facts are not disputed by OrthoTec, except as noted.

2. Theken's "evidence" does not create a factual dispute.

and improve the profits and prosperity of the Company." (Compendium, Ex. 2, 101; Ex. 3, 134.) Appreciation Units can result in cash payments of deferred compensation only if a "Major Event" occurs. (SOUF ¶ 30.)[3] No Major Event, as defined in the Plans, has ever occurred. (*Id.* at ¶ 31.) No recipient of Appreciation Units has ever been a Member of Theken. (*Id.* at ¶ 35.)

REO is a limited liability company organized under the laws of West Virginia. (*Id.* at ¶ 37.) Brad Harris has always been the manager and majority owner of REO. (*Id.* at ¶ 38.) REO never designed, manufactured or mechanically tested spinal implants. (*Id.* at ¶ 39.) Until September 2004, REO's business was purchasing spinal products at a substantial discount from the retail price and then re-selling those products to hospitals or medical offices through independent sales agents. (*Id.* at ¶ 40.) REO's role in the sale of spinal products was between the manufacturer of the products and the independent sales agents that sold them to hospitals and medical offices. (*Id.* at ¶ 41.)

Before late July 2002, REO bought from OrthoTec, LLC ("OrthoTec"), implants that were manufactured by Eurosurgical, S.A. ("Eurosurgical") in France. (*Id.* at ¶ 44.) From July 2002 until July 2004, REO bought implants directly from Eurosurgical. (*Id.* at ¶ 45.) In 2004, REO had approximately 26 independent sales agents that were actively selling its spinal products in various geographic markets throughout the country. (*Id.* at ¶ 47.) Brad Harris had an ownership interest in one of these independent sales agents, R & B Medical. (*Id.* at ¶ 50.) Except for R & B, these sales agents were independent companies or individuals; they were not owned or controlled by REO Spineline, LLC. (*Id.* at ¶ 49.) REO's written con-

tracts with the independent sales agents generally allowed REO to assign its rights under the contracts to a third party. (*Id.* at ¶ 51.)

REO Spineline, LLC never carried, marketed or sold any spinal implant product known as "Natura" or any corpectomy or interbody spinal implant made of PEEK material. (*Id.* at ¶ 53.)[4] In August 2004, OrthoTec obtained a California state court judgment against Eurosurgical that prevented Eurosurgical from continuing to provide spinal implants to REO. (*Id.* at ¶ 54.) REO remains a limited liability company and is not dissolved according to the West Virginia Secretary of State. (*Id.* at ¶ 57.)

In early September 2004, Brad Harris told REO's employees that they would be terminated at the end of the month. (*Id.* at ¶ 58.) REO's employees never had any written confidentiality agreements or non-competition agreements with REO. (*Id.* at ¶ 60.) REO never told its employees that the identities of the independent sales agents were confidential. (*Id.* at ¶ 61.) REO's employees shared personal relationships with the independent sales agents that were cultivated through years of affiliation. (*Id.* at ¶ 63.) Because of these personal relationships, independent sales agents would likely choose to follow salespersons who changed jobs in the spine industry. (*Id.* at ¶ 65.)

In September 2004, Theken learned from communications with Brad Harris that REO would be terminating its employees later that month. (*Id.* at ¶ 67.) In September 2004, several former REO employees sent resumes and cover letters to Theken seeking employment. (*Id.* at ¶ 68.) Theken was not obligated to hire any of REO's former employees. (*Id.* at ¶ 69.)

---

**3.** OrthoTec's "evidence" does not create a factual dispute.

**4.** OrthoTec states that this fact is "disputed," but provides no evidence.

In September 2004, Theken was looking to hire additional employees because it was launching a new product, the Coral Spinal System. (*Id.* at ¶ 71.)

On or about October 1, 2004, Theken entered into at-will employment agreements with ten former REO employees. (*Id.* at ¶ 74.) They were all initially hired on a 90–day probationary basis. (*Id.*) Theken later terminated three of these persons. (*Id.* at ¶ 75.)

On or about September 17, 2004, REO notified its independent sales agents that REO was terminating their contracts and would no longer be able to supply spinal products. (*Id.* at ¶ 85.) Six independent sales agents that previously represented REO, but not Theken, chose to develop new business relationships with Theken. (*Id.* at ¶ 87.)[5] Eleven independent sales agents that previously represented REO chose not to represent Theken, and nine independent sales agents that previously had represented both REO and Theken continued to represent Theken. (*Id.* at ¶¶ 88, 89.) REO never assigned or purported to assign to Theken any contract concerning any independent sales agent, and Theken never assumed or asserted any right under any REO contract with a sales agent. (*Id.* at ¶ 90.) Independent sales agents are separate companies or individuals who are independent contractors that make their own decisions whether to do business with Theken Spine, LLC or any other medical device manufacturer. (*Id.* at ¶ 91.) No former independent sales agent of REO has ever been a Member, or owned any Membership Units, of Theken. (*Id.* at ¶ 93.)

As an employee of Theken, Brad Harris was paid an annual salary of $500,000 and had the potential to receive an additional $500,000 bonus based on performance. (*Id.* at ¶ 78.) Brad Harris' title was "President of Sales" until the termination of his employment on August 31, 2005. (*Id.* at ¶ 79.) According to Theken's Amended and Restated Operating Agreement, only "Managers" are vested with the power to govern the company's business affairs. (*Id.* at ¶ 18; Compendium, Ex. 1, 28.) As of January 1, 2005, Brad Harris received roughly 107,000 Appreciation Units in one of Theken's Plans. (*Id.* at ¶ 81.)

Most of the former REO employees live in Morgantown, West Virginia, which is approximately a 2–1/2 hour drive from Theken's headquarters in Akron, Ohio. (*Id.* at ¶ 94.) Theken leased some, but not all, of the office space that had been occupied by REO at 7000 Hampton Center, Morgantown, West Virginia. (*Id.* at ¶ 98.) Theken paid a monthly rent of approximately $4,581 for the Morgantown office space to the owners of that property, initially T. Bradley Harris, LLC and later HRP, LLC. (*Id.* at ¶ 99.) Theken rented an airplane from T. Bradley Harris, LLC for a monthly lease of approximately $9,171, plus related operating expenses, which was terminated in August 2005. (*Id.* at ¶ 123.)

In October 2004, REO began removing its product inventory and office equipment from the Morgantown office space. (*Id.* at ¶ 101.) Beginning in and after October 2004, Theken began to supply the Morgantown space with Theken's own office equipment and supplies. (*Id.* at ¶ 102.) Beginning in and after October 2004, Theken also transferred from its Akron facility to the Morgantown office space new product inventory that Theken designed, developed, and manufactured. (*Id.* at ¶ 104.)

Theken never received, acquired, or was assigned any account receivable of REO. (*Id.* at ¶ 113.) Theken never received, acquired, or was assigned any product inven-

---

**5.** OrthoTec's "dispute" is simply an attempt to avoid admitting this uncontroverted fact.

tory of REO. (*Id.* at ¶ 114.) Theken never sold, marketed, or offered for sale any product inventory of REO. (*Id.* at ¶ 115.) Theken never acquired any telephone or facsimile numbers of REO. (*Id.* at ¶ 116.) Theken never received, acquired, or was assigned, nor did it assume, any contracts or agreements of REO. (*Id.* at ¶ 117.) Theken never received, acquired, used, or was assigned any right to the name REO. (*Id.* at ¶ 119.) Theken never acquired any ownership or equity of REO. (*Id.* at ¶ 121.) Neither Theken, nor any of its Members, ever acquired any units or equity of REO. (*Id.* at ¶ 122.)

## IV. DISCUSSION

Defendant seeks a judgment that it is not liable as a successor in interest to Defendant REO.[6]

OrthoTec alleges in the Third Amended Complaint that: "in or around September of 2004, defendant REO engaged in a wholesale transfer of its business, including its employees, managers, owners, distributors, customers, sales efforts, and office space, to defendant Theken ...." (TAC ¶ 10.) Moreover,

> such transfer was a *de facto* merger or consolidation between the two entities and ... defendant Theken Surgical is a mere continuation of REO Spineline, that engages in the same business efforts, with the same employees, managers, owners, distributors, customers, sales efforts, and office space, such that

defendant Theken Surgical has succeeded to the liabilities and obligations of defendant REO.

(*Id.*)

> It has been generally stated that "where one corporation sells or transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the former unless (1) the purchaser expressly or impliedly agrees to such assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape liability for debts."

*Franklin v. USX Corp.*, 87 Cal.App.4th 615, 621, 105 Cal.Rptr.2d 11 (2001) (citation omitted).[7]

The exceptions to the general rule of successor nonliability apply only "where all or substantially all of the corporation's assets are purchased ...." *Acheson v. Falstaff Brewing Corp.*, 523 F.2d 1327, 1330 (9th Cir.1975); *see also Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443, 1449 (1st Cir.1995) (no "successor liability under the 'mere continuation' or 'de facto merger' doctrines absent any evidence of an inter-corporate asset transfer"); *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir.1991) ("a prerequisite for the imposition of liability against a corporation as a mere continuation of a

---

6. The Court's analysis of successor liability is based on California law. The parties do not dispute that California law applies. Moreover, to the extent that "federal common law" should apply, the Court finds that the analysis is identical. *See. e.g., Atchison, Topeka and Santa Fe Rw. Co. v. Brown & Bryant*, 159 F.3d 358, 362 (9th Cir.1997) ("At this juncture, the 'federal common law' rules for successor liability under CERCLA in this circuit mirror the traditional successor liability rules of most states, including California.").

7. "In addition, under certain limited circumstances an exception has been judicially created to provide a remedy against the successor when a person has been injured by the predecessor's product." *Franklin*, 87 Cal.App.4th at 621, 105 Cal.Rptr.2d 11. However, courts have declined to expand the product line exception beyond the arena of product liability. *See id.* at 628, 105 Cal.Rptr.2d 11.

predecessor is a sale or transfer of all, or substantially all, the assets of the latter to the former"). The Court considers whether there are any genuine issues of material fact as to successor liability on a theory of either de facto merger or mere continuation.

### A. *REO Did Not Transfer All or Substantially All of its Assets*

According to Defendant, REO's assets as of September 30, 2004 included: (a) $2,325,818.32 cash in the bank; (b) $3,002,776.25 accounts receivable; (c) $3,727,867.32 inventory; (d) $971,792.54 property and equipment; and (e) $385,004.68 other assets. (SOUF ¶ 108.)

Plaintiff disputes this, but does not offer any contradicting evidence.[8] Instead, Plaintiff merely argues that Defendant did not receive any of REO's assets because REO's tangible assets essentially "totaled zero." (Opp. at 10.) Plaintiff contends that (a) REO was enjoined from selling its inventory after the state court judgment;[9] (b) the accounts receivables reflected transactions in violation of OrthoTec's trademark rights; (c) the cash in bank was used for REO's winding down;[10] and (d)

the property and equipment was composed of instruments that could be used only in connection with OrthoTec's products. (Opp'n 10:8–27; 11:1–3.) OrthoTec's opposition is merely argument that ultimately confirms that these assets were not transferred.

Plaintiff contends that Theken received REO's principle "intangible asset": sales personnel, a network of distributors, and a base for operations.

Defendant hired at least seven of REO's former employees, but these employees are not "intangible assets." In September 2004, having been told their termination was imminent, several former REO employees sent resumes and cover letters to Theken seeking employment. (SOUF ¶ 68.) It is undisputed that no former REO employees had employment agreements that prohibited them from becoming Theken's employees. (*Id.* at ¶ 78.) Each of the former employees was interviewed by Randy Theken or Ron Clough (Theken's Chief Financial Officer), and a decision was made as to whether each applicant merited employment. (*Id.* at ¶ 73.) REO's former employees were not re-

---

**8.** OrthoTec points to Theken's own evidence, but does not explain why it fails to support Theken's fact. It also points to Exhibit D to the Ross Declaration, which was not provided.

**9.** Defendant objects to Plaintiff's reference to the state court judgment as hearsay. But Plaintiff only refers to the outcome of the state court judgment, and not any findings of fact contained within the judgment. ("A prior judgment is not hearsay, however, to the extent that it is offered as legally operative verbal conduct that determined the rights and duties of the parties."). *United States v. Boulware*, 384 F.3d 794, 806 (9th Cir.2004).

Plaintiff's argument is still unpersuasive. In California, "a judgment is not final for purposes of collateral estoppel until final disposition on appeal ...." *Swaffield v. Universal Ecsco Corp.*, 271 Cal.App.2d 147, 159–60,

76 Cal.Rptr. 680 (1969); Cal.Code Civ. Pro. § 1049. Although Plaintiff contends that "in 2005, the U.S. Customs Service seized all these 'assets,'" Plaintiff provides no evidence in support of this allegation. (*See* Opp'n 10:14–15.) Moreover, REO's assets were allegedly transferred to Theken in or about September 2004. Accordingly, the Court does not accept Plaintiff's argument that "the biggest component of these 'assets,' ... could not have been transferred ...." (*Id.* at 10:11–12.) Neither does the Court consider Plaintiff's argument regarding REO's accounts receivables and instruments, which rests also on the non-final state court judgment.

**10.** That REO used this substantial amount of cash to pay its debts (Opp. at 10:22–24), establishes that it was not transferred to Theken and detracts from OrthoTec's argument that the transfer was to avoid paying creditors.

quested to sign an employment agreement with Theken. Defendant's mere hiring of former REO employees, absent any allegations or evidence of an assignment of contract,[11] is not considered a transfer or acquisition of REO's assets. *See, e.g., Atchison*, 159 F.3d at 365 ("... PureGro merely offered employment to PCAs that would be out of work when B & B closed its doors. No agreement between PureGro and B & B required PureGro to employ the PCAs.").

Plaintiff contends that REO's sales network generated $25 million in sales per year. However, Defendant did not "acquire" REO's assets merely by hiring six of REO's twenty-six former independent sales agents.[12] Additionally, it is undisputed that REO's conventional intangible assets, such as its trade name and its customer lists, were not acquired by Defendant.

It is undisputed that Defendant (a) leased some of the office space previously occupied by REO, and (b) used T Bradley Harris LLC's airplane. (SOUF ¶¶ 9, 123.) Neither the property nor the airplane were transferred to Defendants. Defendant paid approximately $4,581 per month for the office space, and $9,171 per month, plus related operating expenses, for the airplane. (*Id.* at ¶¶ 99, 123.) Plaintiff does not argue that Defendant leased these assets for less than fair value—or that it paid Harris more than they were worth. It is also undisputed that (a) Thek-

en never used or acquired any telephone or facsimile numbers of REO; (b) Theken never received, acquired, was assigned, or assumed any contracts or agreements of REO; (c) Theken never received, acquired, used or was assigned any right to the name REO; and (d) Theken has never used or conducted business under the name of REO. (*Id.* at ¶¶ 116, 117, 119, 120.)

There is no genuine issue of fact. REO did not transfer all or substantially all of its assets to Theken.

Even if the Court were to assume that occurred, as described below, no exceptions to the general rule of successor liability apply.

### B. *There Was No De Facto Merger*

■ Courts have described five factors which indicate whether a transaction cast in the form of an asset sale[13] actually achieves the same practical result as a merger: (1) was the consideration paid for the assets solely stock of the purchaser or its parent; (2) did the purchaser continue the same enterprise after the sale; (3) did the shareholders of the seller become shareholders of the purchaser; (4) did the seller liquidate; and (5) did the buyer assume the liabilities necessary to carry on the business of the seller?

*Marks v. Minnesota Mining & Manufacturing Co.*, 187 Cal.App.3d 1429, 1436, 232 Cal.Rptr. 594 (1986).

---

11. As for REO's employees, it is undisputed that Defendant hired ten of them and later terminated three. Although Plaintiff contends that Defendant hired all but one of REO's former employees, Defendant argues that four were never hired at all. The evidence Plaintiff offers in support of its argument, however, does not contradict the evidence submitted by Defendant. In his deposition, Harris vaguely states: "Some of the workers went to work for Theken." (Ross Decl., Harris Depo., 73.)

12. Defendant contends that REO's distribution agreements allowed REO to substitute products. (Reply 6 n. 5.) Thus, even though REO could have assigned these distribution agreements to Theken, no assignment was made. The Court, however, does not consider this evidence because it is not properly authenticated by a party with personal knowledge.

13. Of course, this transaction was not cast in the form of an asset sale.

■ Addressing the first factor, there are no genuine issues of fact as to whether Theken paid for any of REO's assets in the form of stock. It is undisputed that Theken leased the office space and airplane formerly used by REO. The property and airplane were owned by T. Bradley Harris, LLC, not REO. Theken did not assume REO's lease, if there was one, for these "assets." In any event, it is also undisputed that Theken paid approximately $4,581 per month for the office space, and $9,171 per month, plus related operating expenses, for the airplane. (SOUF ¶¶ 99, 123.) Plaintiff also contends that "Harris, his distributors and his consultants were being paid in equity." (Opp'n 16:16.) However, even if the Court accepted that the Appreciation Units are a form of equity, it is undisputed that Theken did not pay the former REO employees solely in terms of Appreciation Units. (*See, e.g.,* Compendium, Ex. 4, 174 ("For the services rendered by Employer pursuant hereto, Employer shall compensate Employee by payment of an initial annual salary of $500,000 ....").)

Next, the Court considers whether Theken continued the same enterprise after the sale. Theken hired some of REO's former employees, developed relationships with some of REO's independent sales agents, and operated out of the same office space. However, Theken did not, and could not, continue the distribution of the Eurosurgical products formerly marketed by REO. Theken marketed its own products, including its new product, the Coral Spinal System. It retained its own trade name, and did not acquire any of REO's telephone or facsimile numbers.

Additionally, Theken avers that its lease of REO's former office space is only temporary, and that it has ended its lease of

REO's airplane. (SOUF ¶¶ 106, 123.) [14] Theken's expansion of its own business of designing, developing, manufacturing, mechanically testing, and selling medical orthopedic devices—even with the assistance of REO's former employees and agents, office space and airplane—does not constitute a continuation of REO's business. *See Acheson,* 523 F.2d at 1330 ("The purchasing corporation is in no sense a continuation of the selling corporation. Indeed, the unbroken chain of business continuity here is in [the successor's] operations, not [the former company's].").

As discussed above, Plaintiff contends that the Appreciation Units Theken offered to its executive presidents, employees, and distributors are forms of equity. The "characteristics usually associated with common stock [are] (I) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value." *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 686, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985).

Here, the Appreciation Units allow beneficiaries to receive a cash payment on the occurrence of a bona fide sale of Theken, not on an apportionment of profits. The Plans define this cash payment as "deferred compensation." (Compendium, Ex. 2, 128.) The beneficiaries of the Appreciation Units receive cash payments only. Beneficiaries have no voting rights, nor can they assign or pledge the Appreciation Units. Pursuant to the terms of the Plans: "Nothing ... shall be construed to ... give a Participant any rights, entitlements or benefits of any kind or nature

---

14. Plaintiff disputes this fact, but offers no contradicting evidence. The evidence cited to refers only to the office location as of 2005 and does not negate any future 2006 plans to relocate.

whatsoever with respect to Member Units of the Company."[15] (Compendium, Ex. 2, 109–110.) Moreover, the Appreciation Units are not "subject to alienation, sale, assignment, pledge, encumbrance, or charge, and any attempt to alienate, sell, assign, pledge, encumber, or charge the same shall be void."[16] (*Id.* at 111.) The only attribute that the Appreciation Units share with common stock is the ability to appreciate in value. The Appreciation Units are not common stock.

In some circumstances, non-traditional instruments may also be deemed a form of "stock." Courts look to see "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Here there is no allegation that the beneficiaries made an investment of money. The Appreciation Units were offered merely as an incentive "to attract and retain the services of Persons of outstanding competence, and to provide an incentive for such key Persons to expand and improve the profits and prosperity of the Company."

(Compendium, Ex. 2, 103.) Moreover, beneficiaries receive Appreciation Units solely by the Manager's decision. (*Id.* at 107.) Because the Appreciation Units fail to satisfy the first prong of the test laid out in *Howey*, the Court does not consider further whether the Appreciation Units should be construed as a form of equity.

In support of its argument that the Appreciation Units are a form of equity, Plaintiff relies on a June 14, 2005 memo written by Ben Shappley, Theken's former president.[17] In the memo, Shappley states: "Brad [Harris] was paid in equity for REO and his doctors and his investors were also taken care of." (Opp'n 15:22–26; Ross Decl., Ex. 526.) In his deposition, Shappley later explained that this statement was written in response to "a perceived allegation, from Mr. Bertranou in a written communication to Randy Theken and also a communication to Harris' attorneys where he was saying that Theken Spine and REO Spine were the same and that just absolutely was not true ...." (Dorse Decl., Ex. 14 18–19.) The nature of the interest is not determined by the name it is given. *See, e.g., United Housing*

---

**15.** Contract interpretation is a matter of law. *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 398 (9th Cir.1988) (citation omitted). When the contract terms are clear and unambiguous, summary judgment may be appropriate. *Id.* Although the Court generally considers extrinsic evidence submitted by the parties to prove the meaning of contract terms, *see id.*, as stated in n. 10, Plaintiff has submitted no admissible evidence in regards to interpretation of the Plans.

**16.** An Executive President can assign his or her interest in the Appreciation Units only to a corporation, limited liability company, etc. of which the Executive President owns a minimum of twenty-five percent of the voting interest. (Compendium, Ex. 2, 111.)

**17.** Plaintiff also relies on the deposition testimony of Richard Henson. Mr Henson is the president of Choice Medical, which served as

a distributor for REO and later became an independent sales agent for OrthoTec. (SOUF ¶ 92; Ross Decl. 6.) Although Plaintiff fails to supply the Court with the relevant excerpt, it is provided by Defendant with the Dorse Declaration. In his deposition, Henson states that Harris "said that the equity that we get built would be transferred, the physician equity, the distributor equity would be transferred over to Theken Surgical. He didn't tell us the specific number." (Dorse Decl., Ex. 15, 26.) Defendant objects that this testimony is hearsay. The Court agrees, and finding no hearsay exception, does not consider this evidence for purposes of the summary judgment motion. *See Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir.1990) ("Like affidavits, deposition testimony that is not based on personal knowledge and is hearsay is inadmissible and cannot raise a genuine issue of material fact sufficient to withstand summary judgment.").

*Found., Inc. v. Forman,* 421 U.S. 837, 851, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) ("the name given to an instrument is not dispositive"). Its characterization, when supported by undisputed facts, is a question of law. Although the Appreciation Units may have served as a valuable and attractive incentive, they did not constitute equity in Theken.

It is undisputed that REO remains a limited liability company and has not been dissolved. (SOUF ¶ 57.)

Finally, it is undisputed that Theken never received, acquired or was assigned, nor did it assume, any contracts or agreements of REO. (SOUF ¶ 117.) It is undisputed that Theken never received, acquired or was assigned any product inventory of REO. (*Id.* at ¶ 114.) Plaintiff has offered no evidence that Theken assumed any of REO's liabilities. It has not even identified what those liabilities are—except as they relate to this litigation.

Based on this analysis of the *Marks* factors, the Court finds that Plaintiff has failed to raise a genuine issue of material fact as to whether a de facto merger occurred.

The Court must also consider whether adequate consideration was paid for the "acquisition" of REO's assets. *Franklin,* 87 Cal.App.4th at 625, 105 Cal.Rptr.2d 11 ("The crucial factor in determining whether a corporate acquisition constitutes either a de facto merger or a mere continuation is the same: whether adequate cash consideration was paid for the predecessor corporation's assets."). It is undisputed that Theken did not obtain any ownership interest in the property or airplane. In any event, paid monthly for their use. (SOUF ¶¶ 99, 123.) Plaintiff does not dispute nor offer any evidence that this consideration was inadequate. They weren't owned by REO, and there cannot have been any prejudice to REO's creditors relating to their lease. Based on the Court's previous finding that Theken did not "acquire" REO's former employees or sales agents from REO, and the undisputed facts that Theken did not use REO's trade name, acquire or sell any of its inventory, or acquire its phone numbers, an analysis of inadequate consideration as to these elements is irrelevant.

### C. Theken is Not Merely a Continuation of REO

■ A corporation acquiring the assets of another corporation may be subject to successorship liability as a mere continuation on "a showing of one or both of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; and (2) one or more persons were officers, directors, or stockholders of both corporations." *Ray v. Alad Corp.,* 19 Cal.3d 22, 29, 136 Cal.Rptr. 574, 560 P.2d 3 (1977). Even if Harris served as an officer of both Theken and REO,[18] this is not enough to satisfy the mere continuation test. *See Franklin,* 87 Cal.App.4th at 627, 105 Cal.Rptr.2d 11 ("all of the cases involved the payment of inadequate cash consideration, and some also involved near complete identity of ownership, management or directorship after the transfer"). Accordingly, the common denominator of inadequate consideration "must be present in order to avoid the general rule of successor nonliability." *Id.; accord Maloney v. American Pharm., Co.,* 207 Cal.App.3d 282, 287, 255 Cal.Rptr. 1 (1988) ("Before

**18.** Theken claims that although Harris' title was "president of sales," he was never an officer. (SOUF ¶¶ 79, 80.) It is not clear whether Plaintiff disputes this. The Court need not resolve this issue.

1134

one corporation can be said to be a mere continuation or reincarnation of another it is required that there be insufficient consideration running from the new company to the old.").

Based on the Court's previous finding concerning adequacy of consideration, the Court finds that Theken was not a mere continuation of REO. This is further supported by Theken's retention of its own trade name and sale of its own products. *See Acheson*, 523 F.2d at 1330 ("The purchasing corporation is in no sense a continuation of the selling corporation. Indeed, the unbroken chain of business continuity here is in [the successor's] operations, not [the dissolved corporation's].") [19]

Because there are no genuine issues of fact as to whether Theken acquired substantially all of REO's assets, and whether Theken paid adequate consideration for any acquired assets, the Court finds that Theken is not liable as a successor to REO.

## V. CONCLUSION

For the reasons previously stated, Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

---

19. The Court does not consider whether successor liability is appropriate based on Plaintiff's argument that "Theken's acquisition of REO was for the fraudulent purpose of evading REO's liability to plaintiff." (Opp'n 17:4–5.) Plaintiff did not allege this as a basis for successor liability against Theken in the Third Amended Complaint. Moreover, even if the Court were to consider this argument, (a) the Court already determined that there was no transfer of all or substantially all of REO's assets, and (b) Plaintiff provides no evidence to indicate that a transfer of assets was entered into for the purpose of avoiding liability.