[No. D049989. Fourth Dist., Div. One. Dec. 12, 2007.]

CENTERPOINT ENERGY, INC., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
CITY AND COUNTY OF SAN FRANCISCO et al., Real Parties in Interest.

1102

**COUNSEL**

Akin, Gump, Strauss, Hauer & Feld, Rex S. Heinke, Jessica M. Weisel, Reginald D. Steer, Orrin L. Harrison III and Karen C. Corallo for Petitioner.

No appearance for Respondent.

Cotchett, Pitre Simon & McCarthy, Joseph W. Cotchett, Nancy L. Fineman, Nanci E. Nishimura, Steven N. Williams and Barbara L. Lyons for Real Parties in Interest.

**OPINION**

**HUFFMAN, J.**—This writ petition arises out of a number of coordinated antitrust actions by a group of independent plaintiffs, the Cities and Counties of San Francisco and Los Angeles et al. (plaintiffs), in which plaintiffs contend that numerous energy-related defendants engaged in a conspiracy from 1999 to 2002 to manipulate prices in the California retail natural gas market. (Bus. & Prof. Code, § 16700 et seq., the Cartwright Act.) Plaintiffs are asserting that all the defendants falsely reported natural gas trades,

manipulated price indices through churning activity, and engaged in wash trades, causing plaintiffs as consumers of energy to incur damages and to be entitled to equitable relief.

Plaintiffs sued, among others, defendant and petitioner CenterPoint Energy, Inc. (CenterPoint), a Texas public utility holding company, on a successor liability theory, based on its formation during 2000 to 2002 out of a former parent, Reliant Energy, Inc. (Former Reliant or Former REI), a Texas utility holding company. In addition, plaintiffs have sued New Reliant, Inc. (New Reliant or New REI; formerly known as Reliant Resources, Inc. (RRI)), also formed out of Former Reliant at the same time and for a different purpose. Other defendants are a number of its associated entities, including a wholly owned California subsidiary, Reliant Energy Services, Inc. (RES).

Although the subsidiary RES has submitted to California jurisdiction in these coordinated actions, both the petitioners CenterPoint and New Reliant (sometimes here defendants) are challenging the exercise of jurisdiction by the California courts. (*Reliant Energy, Inc. v. City of Los Angeles* (Dec. 12, 2007, D049988) [nonpub. opn.] (the companion case).) They each responded to the complaints by filing separate motions to quash service of summons for lack of personal jurisdiction. (Code Civ. Proc., § 418.10.) Those motions were denied and defendants have each filed petitions for writs of mandate in this court to overturn the trial court's rulings, utilizing the same record in each. We issued orders to show cause and an order to consider the petitions together.[1]

In this opinion, we address the ruling on petitioner CenterPoint's motion to quash service of summons. CenterPoint contends the trial court erred as a matter of law in exercising personal jurisdiction over it, based on the CenterPoint history of restructuring from Former Reliant into a separate company that it contends does not fall under any of the recognized exceptions to the normal rule of successor nonliability. (See, e.g., *Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 31 [136 Cal.Rptr. 574, 560 P.2d 3] (*Ray*); *Sanders v. CEG Corp.* (1979) 95 Cal.App.3d 779, 787 [157 Cal.Rptr. 252] (*Sanders*).) Specifically, CenterPoint argues it is undisputed that it took over only the interests and liabilities of the *regulated* utility businesses previously conducted by Former Reliant, while New Reliant took over the interests and liabilities of Former Reliant with regard to the *unregulated* energy businesses that are the subject of the allegations in these complaints. Accordingly, CenterPoint

---

[1] We issue a separate, nonpublished opinion this date in the companion case, denying the New Reliant petition that challenged the trial court's denial of its motion to quash service of summons, because the record supports the findings that sufficient minimum contacts with California exist on an agency basis, as to New Reliant. (*Reliant Energy, Inc. v. City of Los Angeles, supra,* D049988.)

contends it could properly become the successor in interest to Former Reliant regarding the regulated businesses, while still not being subject to successor liability for certain other claims against Former Reliant and its other successor (New Reliant), that arose from a different set of businesses. It argues these contractual arrangements were legitimate business strategies, not found to be fraudulent in the ruling, and the applicable authorities do not allow any basis to find CenterPoint to be a successor to Former Reliant in the current litigation. CenterPoint further argues the trial court erred in ruling a de facto merger had taken place. (See *Marks v. Minnesota Mining & Manufacturing Co.* (1986) 187 Cal.App.3d 1429, 1435–1437 [232 Cal.Rptr. 594] (*Marks*).)

As a backup position, CenterPoint contends that even if this matter could not be resolved as a matter of law through a review of the documentary evidence, the trial court nevertheless erroneously interpreted the evidence, and should not have found any substantial ties to California stemming from the activities of its predecessor company, Former Reliant. CenterPoint argues its predecessor was not properly subject to California jurisdiction during the relevant time periods, due to lack of sufficient minimum contacts. Under that approach, CenterPoint as successor would likewise not be subject to personal jurisdiction here.

In the companion case, we rule that New Reliant is in fact properly subject to personal jurisdiction in California, based on an agency theory. The consolidated record supports a conclusion that Former Reliant utilized the subsidiary RES and controlled and directed RES business sufficiently during the relevant time periods to justify the exercise of general jurisdiction over its successor New Reliant, regarding the unregulated business activity during the period covered by the complaint. We rejected New Reliant's theory that it, at all times, acted merely as a holding or parent company exercising only general corporate oversight over RES. (*Reliant Energy, Inc. v. City of Los Angeles, supra,* D049988.)

Our current task is to determine the merits of CenterPoint's legal arguments, both independently and in light of the ruling issued in the companion case. As we will explain, we determine that the trial court erred as a matter of law in applying the rule of successor liability for jurisdictional purposes to CenterPoint, due to the undisputed evidence about the nature and purpose of the corporate restructuring processes that took place here. Moreover, it is consistent with our finding in the companion case (that New Reliant is subject to general jurisdiction on an agency theory, regarding the unregulated businesses) to find that CenterPoint is not subject to personal jurisdiction in California, because it was New Reliant that succeeded to the unregulated businesses that are involved in the complaints. However, CenterPoint did not, instead succeeding to the interests and liabilities of the regulated energy

businesses, which are not the subject of this litigation. Accordingly, the trial court erred in denying the CenterPoint motion to quash, and we grant the petition with directions to issue a different order on the motion.

## FACTUAL AND PROCEDURAL HISTORY

### A. *Nature of Lawsuit*

Plaintiffs are a number of public entities and energy customers. Out of 16 coordinated actions, all filed in 2004, two typical complaints were brought by the City of Los Angeles (acting by the Dept. of Water & Power) and the County of Santa Clara. These antitrust complaints allege that from 1999 to 2002, New Reliant and all other defendants falsely reported natural gas price information and engaged in sham or wash trades to artificially inflate the price of natural gas in California, causing damages to energy consumers.[2]

These independent plaintiffs allege in their complaints that all defendants had sufficient minimum contacts within California, and caused effects here, "to make the exercise of jurisdiction over each Defendant by California courts consistent with traditional notions of fair play and substantial justice. Each Defendant participates, or during the relevant period did participate, in the California market through the production, distribution, transmission or sale or trade of natural gas, or natural gas transportation in California, or by having or using a facility located in California to facilitate the transmission, distribution, sale or trade of natural gas in California." Plaintiffs also allege each defendant or agent transacts business in California, and carried out unlawful conduct which had adverse effects in California.

### B. *Brief History of Parties' Restructuring and Transactions*

Lengthy discovery, as reflected in the supporting declarations and attached evidence in the motion and opposition, revealed the following information. Former Reliant was a Delaware corporation based in Texas, which had numerous subsidiaries. One of these, Reliant Energy Power Generation, Inc. (REPG), purchased several California natural-gas-fueled power plants in 1997–1998, with Former Reliant supplying the guarantees for funding and approvals.[3]

---

[2] Although there is also a separate class action complaint that is part of the coordinated actions, the trial court noted in the ruling that is challenged here that the class plaintiffs were no longer opposing the motions to quash, and we need not discuss any class issues regarding this petition.

[3] In the trial court, plaintiffs and CenterPoint stipulated to a protective order to seal a number of the documents relied on in the moving and opposing papers, as confidential trade materials. The record in this court likewise contains this sealed material, conditionally lodged

In 1999 Texas enacted a law requiring electric utilities to separate their generation, transmission/distribution, and retail functions into three different units. In August 2000, Former Reliant created a business separation plan to restructure itself to comply with this change in Texas law. From August 2000 to August 2002, Former Reliant carried out the plan to separate into two major companies: CenterPoint and New Reliant. New Reliant, a Delaware corporation with its principal place of business in Texas, was created in August 2000 and initially named RRI (but renamed itself in 2004). In January 2001, New Reliant (operating as RRI) received the assets and liabilities of the unregulated businesses of Former Reliant (e.g., market-based energy trading, merchant generation, and retail energy services businesses and subsidiaries).

In November 2001, Former Reliant sent a notice to shareholders, entitled "Proposed Holding Company Formation, Notice to Shareholders." This document used the term "merger agreement" when discussing the proposed changes in the relationship between Former Reliant and CenterPoint, i.e.: "CenterPoint Energy and Reliant Energy have entered into the *merger agreement* attached as Annex A" and "the board of directors recommends that Reliant Energy shareholders vote for approval of the *merger agreement.*" (Italics added.) Eventually, in August 2002, Former Reliant (having already divested itself of most of its assets except a Texas regulated utility) merged with a subsidiary of CenterPoint, causing CenterPoint to switch places with Former Reliant and become the overall parent company. On September 30, 2002, CenterPoint as the temporary parent distributed its shares of New Reliant's stock to shareholders on a pro rata basis, completing the process. Thus, from October 2002, CenterPoint officially took over Former Reliant's regulated businesses, i.e., the traditional utility businesses.

From January 2001, to carry on Former Reliant's unregulated businesses, such as the natural gas market trading that is the subject of these consolidated actions, New Reliant utilized (among other subsidiaries) RES, a wholly owned subsidiary that had already been conducting business in California, but is headquartered in Texas.[4] RES is also a named defendant and is participating in the underlying litigation, having consented to personal jurisdiction in California. As a subsidiary, RES was expected to perform a specific function of New Reliant's overall business in the energy market, the gas trading

---

pursuant to the stipulated protective order. Other such documents relied on are in the unsealed portion of this record, filed by both plaintiffs (Los Angeles) and CenterPoint. However, we note that the parties in their briefs, which were not sealed, freely refer to the evidentiary showings by each side on the jurisdictional facts asserted. This court has not been requested to nor has issued any separate order to seal this record, as acknowledged by the parties at oral argument, and we therefore discuss the jurisdictional facts generally.

[4] We will not discuss here in detail the issues regarding New Reliant, as those are addressed in the companion case opinion filed this date.

functions in the spot or 24-hour market. These trading functions involve the creation of bidding strategies, formulation of prices, and trading natural gas.

In April 2001, New Reliant obtained a certificate of qualification to do business in California and designated an agent for service of process. From March 2002 to December 2003, New Reliant subleased a small office in Sacramento, to be used by an employee of the same subsidiary that purchased the power plants, nonparty REPG.

Another associated subsidiary of New Reliant was Reliant Energy Corporate Services (RECS), which performed payroll, human resources, and other business functions for other Reliant companies, to provide an economy of scale. Reliant Energy Wholesale Services (REWS) was another affiliated company in Texas that provided services to New Reliant. Its group president, Joe Bob Perkins, was a member of the chief executive office of New Reliant and was also a director of RES during the relevant time periods (2000–2002).

### C. *CenterPoint Motion to Quash; Opposition; Reply*

CenterPoint moved to quash service of summons on the ground that it was not properly subject to suit in California. It argued plaintiffs could not establish either general or specific jurisdiction because neither it nor its predecessor, Former Reliant, had sufficient minimum contacts to justify personal jurisdiction. (Code Civ. Proc., § 418.10.) It relied on its history of restructuring, in which it was transformed into a foreign holding company that controlled only regulated businesses, which are not the subject of this complaint.

In support of its motion, CenterPoint submitted a declaration from its senior counsel and assistant corporate secretary, Richard B. Dauphin, who explained the complex business separation plan by which Former Reliant separated its regulated and unregulated businesses. This multistep process is also set out in the opposition declaration's exhibits, which include the master separation agreement. The key steps in the process (as already outlined) were: (1) beginning in August 2000, Former Reliant formed two independent companies, CenterPoint and New Reliant; (2) in January 2001, Former Reliant transferred its unregulated businesses to New Reliant, leaving Former Reliant with only the regulated businesses; (3) in August 2002, Former Reliant merged with a subsidiary of CenterPoint, causing CenterPoint to switch places with Former Reliant and become the overall parent company; and (4) on September 30, 2002, CenterPoint distributed its shares of New Reliant's stock to CenterPoint's shareholders on a pro rata basis, causing the two companies to be fully separated.

As of October 2002, CenterPoint did not retain any corporate relationship with or ownership interest in New Reliant or its subsidiaries. CenterPoint therefore argued neither it nor Former Reliant had significant contacts with California regarding the events alleged in the complaint during 1999 to 2002. Further, it argued other related entities' contacts with California were not sufficient to establish personal jurisdiction on an agency basis or otherwise.

In the companion case motion by New Reliant, New Reliant submitted a declaration from Michael Jines, its senior vice-president, general counsel and corporate secretary. He also explained the highly technical restructuring process and the business separation plan of Former Reliant, resulting in the formation of New Reliant and its subsidiaries, including RES. He stated that New Reliant "operates exclusively as a holding company."

The trial court allowed supplemental briefing, and CenterPoint supplied a declaration from its vice-president and treasurer, Marc Kilbride, who was involved in the separation process. He explained that there were two types of debt allocated between the two companies. CenterPoint was allocated all of the bank debt that existed at the parent company level, $4.7 billion, so that New Reliant could be a more viable company, with readily available capital and credit. New Reliant took the debt incurred directly by the unregulated subsidiaries. Kilbride explained his view that when three of Former Reliant's subsidiaries were valued at $10 each as part of the separation process, this was not "inadequate" consideration for the transaction as a whole, but rather reflected that it was unclear whether those particular companies would be utilized in the future, as the main focus was upon the two major companies that were being formed. He contended the separation agreement reflected a fair transaction to all parties, including future creditors.

CenterPoint and plaintiffs also provided background documents about the business separation plan. These included the November 2001 "Proposed Holding Company Formation, Notice to Shareholders," sent by Former Reliant to shareholders, discussing the continuing changes in the relationship between Former Reliant and CenterPoint, i.e.: "CenterPoint Energy and [Former] Reliant Energy have entered into the *merger agreement* attached as Annex A" and "the board of directors recommends that Reliant Energy shareholders vote for approval of the *merger agreement*." (Italics added.)[5]

---

[5] In its petition, CenterPoint makes a secondary argument that the transaction described in the notice to shareholders did not represent a de facto merger, but instead actually involved the transfer of a single regulated utility in Texas (all that remained of Former Reliant) into an indirect wholly owned subsidiary of CenterPoint. At the trial court hearing, CenterPoint's attorney attempted to put that portion of the transaction in perspective, using charts and tables. The main focus at this point is on the issues regarding whether the restructuring transaction was supported by adequate consideration ($4.7 billion in liabilities assumed by CenterPoint

Plaintiffs opposed the motion and submitted extensive materials for judicial notice, to argue Former Reliant, as the predecessor of CenterPoint, had purposefully availed itself of the benefits of conducting business in California, as alleged in the complaint, so that specific jurisdiction was authorized. Also, plaintiffs argued that general jurisdiction was appropriate on an agency theory, based on the California activities of RES, because Former Reliant had exercised day-to-day control over it and other subsidiaries. Plaintiffs consistently took the position that New Reliant was subject to personal jurisdiction because it is Former Reliant's successor, with respect to the Former Reliant unregulated businesses that are involved in the underlying litigation. Plaintiffs argued that general jurisdiction was appropriate on an agency theory, based on the activities of RES in conducting daily gas trading on the spot market, and based on New Reliant's involvement in and oversight of those activities. To support these claims of oversight, plaintiffs submitted evidence about certain reporting practices by RES to New Reliant/RRI senior management personnel in 2000 and later.[6]

In its reply papers, CenterPoint contended none of these alleged contacts amounted to a substantial contact for jurisdictional purposes, due to the distinctions between itself and New Reliant with regard to the types of businesses owned. CenterPoint argued plaintiffs failed to recognize the significant effect of the business separation plan and its distribution of corporate liabilities.

## D.  *Ruling*

The trial court issued a tentative ruling and heard argument. After receiving two sets of briefs, the court confirmed its tentative rulings and denied the

and other transfers of assets), and the timing of the various events. By the time of the 2002 completion of the corporate restructuring, the previous divestment of the unregulated liabilities by the original holding company in 2001 had already been accomplished, and they were assumed by New Reliant instead of CenterPoint.

[6] The combined record in these cases describes the reporting practices required of RES by New Reliant/RRI senior management personnel in 2000 and later: (a) daily reports of the California power plants' hedging activities ("Strategic Asset Reports" or SAR), regarding the coordination of power generation and RES's trading activity; (b) "DPR" (daily position reports) from RES to New Reliant executives and Former Reliant management, to be evaluated by their risk control officers, reflecting the value and long-range change in value of the company's positions in the markets in which RES was trading, such as natural gas, as well as profits and losses of the previous day's trading, and the status of various risk control limits. These important reporting practices were generally utilized by the parent company in setting and adjusting the "VAR limits" (value at risk), a calculation which took into account the volatility of the market in which trading was done, the terms of the trade, and the "forward price curve" for that market, in order to quantify the maximum risks to which it and/or subsidiaries were exposed on a day-to-day basis. That function was performed by the New Reliant risk oversight committee.

motions to quash service of summons: "The court remains convinced that it has personal jurisdiction over defendants CenterPoint Energy, Inc. and Reliant Energy, Inc. (both Former and New). There is sufficient evidence to support jurisdiction on any one or all of the following bases: (1) specific jurisdiction, (2) agency, (3) the representative services doctrine and (4) successor in interest." Here, we outline the ruling with respect to CenterPoint, according to the different theories of jurisdiction raised. Successor in interest jurisdiction would depend upon an underlying related theory of general or specific jurisdiction over the predecessor, and we will address it separately.

1. *Specific Jurisdiction, Purposeful Availment*

The trial court's tentative ruling found CenterPoint to be the successor in interest to Former Reliant and thereby subject to jurisdiction. It cited to the following factors to support its finding that CenterPoint, through Former Reliant, had purposefully targeted California in its own business activities, in four respects. First, Former Reliant purposefully availed itself of the benefits of conducting activities in California, by participating "in the wrongful 'churning' and 'wash' trades" by RES and individual defendant Mary Kathleen Zanaboni. Ms. Zanaboni testified she worked for RRI (or RES; this is disputed) and conducted gas trades from her apartment in California. In addition, Ms. Zanaboni reported to the RES "desk head" (the individual in charge of gas trading activities) who reported to the office of the chief executive officer of Former Reliant.

Next, the court cited to Former Reliant's "participat[ion] in the purchase of power plants in California. Former REI provided funding and guarantees. [Former] REI guaranteed the purchase of four of the plants and participated in negotiation of the deals. The purchase of the California power plants was part of a corporate strategy to expand its unregulated power generation and trading businesses into California. Former REI provided surety bonds and guarantees. Some of the bonds and guarantees expressly invoked the protection of California law and some specified California forums."

Also, the court relied on the public relations campaign by Former Reliant in 2000–2001. "Former REI issued press releases in California and conducted extensive outreach to California through print, radio and television. Former REI senior management met with its California public relations professionals in Houston and California. Senior management conducted daily telephone conferences with its public relations staff in California from January through August 2001."

Specific jurisdiction was justified because, according to the trial court: "The controversy is related to or arises out of the Defendants' contacts with

California. Plaintiff alleges that Former REI wrongfully manipulated the market through 'churning' and 'round trip' trades. As previously shown, Former REI senior executives participated in the trades. In addition, the purchase of the plants enabled them to manipulate the markets. Furthermore the massive public relations campaign was specifically directed as a response to the price crisis. [¶] Exercising jurisdiction over Former REI and CenterPoint, comports with fair play and substantial justice. Former REI availed itself of the benefits of conducting business in California in the participation and funding of the purchase of the power plants and in conducting the public relations campaign. Therefore, it is not unreasonable to have them come forward in California."

### 2. General Jurisdiction: Agency or Representative Services Doctrine

In the tentative ruling, the trial court initially determined it could properly exercise general jurisdiction over CenterPoint pursuant to the doctrine of agency: "Agency is found where the nature and extent of the control exercised over the subsidiary by the parent is so pervasive and continual, such that the subsidiary is no more than an instrumentality of the principal. [Citation.] Defendants are correct that interlocking officers and directors alone is insufficient. [Citation.] However, here Former REI exercised daily control over its California subsidiaries. [¶] The money was transferred to the parent on a daily basis."

Next, the trial court relied on evidence that "[t]he RES trading 'desk heads' who implemented the 'hedging' of the power generated by the California plants, reported directly to the office of the Chief Executive Officer of Former REI. Senior executives of Former REI received comprehensive daily reports on RES trading activities. The Risk Oversight Committee which was made up of primarily senior former REI executives oversaw all trading activities."[7]

Alternatively, the court ruled that general jurisdiction could be exercised over CenterPoint based upon the representative services theory, "where the subsidiary performs a function that is compatible with, and assists the parent in the pursuit of the parent's own business. [Citation.] It is not found where the parent is merely a holding company whose only business pursuit is the investment in the subsidiary. [Citation.] Former REI was in the power

---

[7] In the companion case motion regarding New Reliant, the trial court found an adequate basis to exercise general jurisdiction over New Reliant pursuant to the doctrine of agency, based on the following approach: The natural gas trading and power marketing conducted by New Reliant's subsidiary, RES, is an essential part of New Reliant's power generation business. Natural gas powered plants, like the California power plants operated by New Reliant's subsidiaries, require a reliable supply of natural gas. Those findings were specific to the unregulated businesses.

business and was not merely holding the California subsidiaries as investments. Based upon all of the above factors, jurisdiction under this theory is appropriate."

The final ruling adopted the above analysis regarding general jurisdiction, to impute the jurisdictional contacts of RES to New Reliant and also to CenterPoint, through Former REI.

### 3. *Successor Liability Jurisdiction*

The trial court issued separate rulings about successor liability, which would be premised upon a finding of general or specific jurisdiction over the predecessor: "CenterPoint is the successor in interest to Former REI. Though CenterPoint argues that after the complete reorganization, it is not successor to the California unregulated utilities, this argument is unavailing for the purposes of jurisdiction." In its final ruling, the court noted it had requested additional briefing on successor liability and other issues, and CenterPoint had raised various arguments seeking to defeat successor liability, which the court thoroughly analyzed as follows:

"The only issue remaining then is whether CenterPoint is a successor in interest to Former REI and therefore subject to the court's jurisdiction. The general rule that a predecessor company is not liable when [a] successor company contractually assumes the predecessor's liabilities does not answer the question of whether two concurrent successor companies and the predecessor can legitimately agree that each will assume only certain aspects of the predecessor's liabilities. The question becomes more complex where the two successor companies are part of one predecessor 'reorganization' rather than a buy out and that reorganization was necessary to comply with the new laws of another State. Given the unusual circumstances, can this agreement be used as a shield to defeat personal jurisdiction? The parties were unable to cite to any case law that was specifically applicable. The *Rego* case, however, is instructive for its direction that each successor liability 'case must be determined on its own facts' [citation] including looking at the 'totality of the unusual circumstances.' [(*Rego v. ARC Water Treatment Co. of Pa.* (3d Cir. 1999) 181 F.3d 396, 403 (*Rego*).)]

"However, case law does support Defendants' position that the ordinary rules of successor liability do apply even when there is a corporate reorganization rather than a buy out. The four exceptions also apply. There is no evidence or indication that CenterPoint expressly assumed the liabilities of the unregulated business side of Former REI. Those liabilities were contractually assumed by New REI. There is no evidence that Former REI's organization was a 'sham.' The reorganization was scrutinized and approved

by both federal and state agencies. Further, assumption of liabilities can constitute sufficient 'consideration' for a legitimate transaction. [(See *Beatrice Co. v. State Bd. of Equalization* (1993) 6 Cal.4th 767 [25 Cal.Rptr.2d 438, 863 P.2d 683] (*Beatrice*).)]

"The factors generally considered for a *de facto merger* are not present. CenterPoint did not absorb Former REI or retain its name. CenterPoint did not take all of Former REI's assets without providing consideration. There is nothing to suggest that either CenterPoint or New REI are not sufficiently funded to meet the claims of creditors. CenterPoint did not continue the same enterprise as Former REI; it continued only the regulated business aspects. For the same reasons, the 'mere continuation' exception would not apply.

"However, CenterPoint's supplemental lodgment, Exhibit 2, contains excerpts from the 'Proposed Holding Company Formation, Notice to Shareholders.' It consistently and frequently uses the term 'merger agreement' when discussing the relationship between Former REI and CenterPoint. At page 12, it states that 'CenterPoint Energy and Reliant Energy have entered into the *merger agreement* attached as Annex A' and 'the board of directors recommends that Reliant Energy shareholder[s] vote for approval of the *merger agreement*.' [Italics added.] The language of Defendants' own exhibit is extremely telling. The transaction as between CenterPoint and Former REI was at least a *de facto merger* if not an actual merger. Accordingly, the merger exception to successor liability applies which subjects CenterPoint to this court's jurisdiction." (Original italics.)

After the court denied its motion to quash, CenterPoint filed this petition for a writ of mandate to overturn the order. (Code Civ. Proc., § 418.10, subd. (c).) We subsequently issued an order to show cause and received further briefing.

## DISCUSSION

As bases for jurisdiction over CenterPoint, the trial court found that general, specific, and successor liability jurisdictional facts had been shown. We must address the complex successor liability issues in light of our conclusions regarding the underlying bases for jurisdiction, if any, over Former Reliant, as well as the evidence of corporate restructuring and allocation of liabilities. We first set out the appropriate standards of review, then outline successor liability principles and apply them to these jurisdictional issues (see pts. II and III, *post*).

# I

## BASIC STANDARDS OF REVIEW

█ State courts will assert personal jurisdiction over nonresident defendants which have been served with process only if those defendants have such minimum contacts with the state to ensure that the assertion of jurisdiction does not violate " ' " 'traditional notions of fair play and substantial justice.' " ' " (*Aquila, Inc. v. Superior Court* (2007) 148 Cal.App.4th 556, 568 [55 Cal.Rptr.3d 803] (*Aquila*), citing *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444–445, 474–475 [58 Cal.Rptr.2d 899, 926 P.2d 1085] (*Vons*).) "It is well established that only ' " 'random,' 'fortuitous,' or 'attenuated' contacts" ' do not support an exercise of personal jurisdiction. [Citation.] In analyzing such issues, the courts have rejected any use of ' "talismanic jurisdictional formulas." ' [Citation.] Rather, ' " 'the facts of each case must [always] be weighed' in determining whether personal jurisdiction would comport with 'fair play and substantial justice.' " [Citation.]' [Citation.]" (*Aquila, supra,* at p. 568.)

█ " '[M]inimum contacts' " may support either general or specific jurisdiction. (*Aquila, supra,* 148 Cal.App.4th at p. 569.) " '[W]here the defendant's contacts with the forum state are so "systematic and so continuous as to make it consistent with traditional notions of fair play and substantial justice to subject the defendant to the jurisdiction of the forum, even where the cause of action is unrelated to the contacts," ' " then the exercise of general jurisdiction is proper. (*Ibid.*) " 'Specific jurisdiction results when the defendant's contacts with the forum state, though not enough to subject the defendant to the general jurisdiction of the forum, are sufficient to subject the defendant to suit in the forum on a cause of action related to or arising out of those contacts. [Citations.] *Specific* jurisdiction exists if: (1) the defendant has purposefully availed itself of forum benefits with respect to the matter in controversy; (2) the controversy is related to or arises out of the defendant's contacts with the forum; and (3) the assertion of jurisdiction would comport with fair play and substantial justice.' [Citation.]" (*Aquila, supra,* at pp. 569–570.)

In *Aquila,* this court resolved a similar petition for a writ of mandate by a different energy defendant, arising out of the same coordinated actions. There we set forth basic rules of review, which we reiterate here: " 'On review, the question of jurisdiction is, in essence, one of law. When the facts giving rise to jurisdiction are conflicting, the trial court's factual determinations are reviewed for substantial evidence. [Citation.] Even then, we review independently the trial court's conclusions as to the legal significance of the facts. [Citations.] When the jurisdictional facts are not in dispute, the question of

whether the defendant is subject to personal jurisdiction is purely a legal question that we review de novo. [Citation.]' [Citations.]" (*Aquila, supra*, 148 Cal.App.4th 556, 568.)

Upon the filing of the motions to quash, "the burden of proof is placed upon the plaintiff to establish the facts of jurisdiction by a preponderance of the evidence. [Citation.] This may be done through presentation of declarations, with opposing declarations received in response. ' "[W]here there is a conflict in the declarations, resolution of the conflict by the trial court will not be disturbed on appeal if the determination of that court is supported by substantial evidence. [Citations.]" [Citation.]' [Citation.]" (*Aquila, supra*, 148 Cal.App.4th at p. 568.) If the plaintiffs are able to make a showing of minimum contacts with the forum state, "the burden shifts to the defendant to present a *compelling* case demonstrating that the exercise of jurisdiction by our courts would be unreasonable. [Citations.]" (*In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 111 [37 Cal.Rptr.3d 258], italics added (*Automobile Antitrust*).) "The merits of the complaint are not yet at issue in that inquiry. [Citation.]" (*Aquila, supra*, at p. 570.)

■ The main general jurisdiction theory is the agency of the subsidiary, RES, for the predecessor company, Former Reliant. "The existence of agency or employment is mainly a question of fact, and the trial court's inference from conflicting evidence is usually upheld. [Citations.]" (3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency and Employment, § 93, pp. 140–141.) "However, where the evidence is undisputed, the issue becomes one of law. [Citations.]" (*Id.* at p. 141.) The issue to be addressed is whether the agent was given authority to act for and in the place of the principal for the purpose of bringing it into legal relations with third parties. (*Violette v. Shoup* (1993) 16 Cal.App.4th 611, 620 [20 Cal.Rptr.2d 358].) Also, " ' "The significant test of an agency relationship is the principal's right to control the activities of the agent. [Citations.] It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent; the existence of the right establishes the relationship." [Citation.]' [Citation.]" (*Ibid.*)

To show agency in this context, a plaintiff cannot merely allege jurisdictional facts, but must "provide affidavits and other authenticated documents in order to demonstrate competent evidence of jurisdictional facts. . . . Declarations cannot be mere vague assertions of ultimate facts, but must offer specific evidentiary facts permitting a court to form an independent conclusion on the issue of jurisdiction. [Citations.]" (*Automobile Antitrust, supra*, 135 Cal.App.4th 100, 110.) Where conspiracy is alleged, an exercise of personal jurisdiction must be based on forum-related acts that were personally committed by each nonresident defendant, and acts of an "alleged coconspirator—cannot be imputed . . . to establish jurisdiction over the third party defendant. [Citation.]" (*Id.* at p. 113.)

Even where the pertinent facts are essentially undisputed, in some cases, the resolution of a particular legal question may require "the drawing of inferences from the presented facts . . . ." (*Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 700–701 [41 Cal.Rptr.2d 352].) In such a case, no pure question of law is presented, and an appellate court must apply the substantial evidence test to a trial court's ruling, giving deference to any inferences drawn by the trial court in support of its resolution of a particular question as a matter of law. (*Id.* at p. 701.)

Similar rules regarding inferences were applied in a jurisdictional context in *Automobile Antitrust, supra*, 135 Cal.App.4th 100, in which the appellate court refused to require the trial court to draw an inference in favor of jurisdiction from certain evidence that could possibly support such an inference, in the conspiracy context, because to do so would incorrectly "lighten plaintiffs' burden of proof of jurisdictional facts." (*Id.* at p. 113.) The appellate court said the trial court acted within its authority when it deemed that the evidence of the nonresident defendants, denying conspiracy allegations, was more persuasive than that offered by the plaintiffs, only suggesting such inferences were possible. (*Id.* at p. 114.)

Regarding the standard of review to be applied here, in light of the above considerations, this record presents a situation in which the jurisdictional facts are initially presented in defendants' moving papers by its own employees and corporate officials, who are presumably the most knowledgeable about their own business structures and practices. Plaintiffs then counter with extensive documentary evidence about RES and parent transactions that they had obtained through discovery, to attempt to show minimum contacts and to refute defendants' claims that there were none. These types of showings require this court to give appropriate deference to factual findings made by the trial court on underlying issues, such as whether defendants had actually maintained the existence of any separateness of corporate structures, or instead compromised it. Likewise, the trial court's ruling addressed the legal theory of agency with relation to the existence of successor liability on conflicting facts, and therefore the following rules of review apply: "On review, we apply our independent judgment to the ultimate question of jurisdiction, but to the extent that the question of jurisdiction turns on factual issues, we are bound by the trial court's findings of fact if they are supported by substantial evidence. [Citations.] We have no power to substitute our own assessment of the facts for that of the trial court if substantial evidence supports [its] finding. [Citation.] That is a trial court function, not one for us as an appellate court." (*Automobile Antitrust, supra*, 135 Cal.App.4th at pp. 113–114.)

## II

## SUCCESSOR LIABILITY RULES

■ The main question presented in CenterPoint's petition is whether a recognized basis for successor liability applies on this record. Successor liability is a well-settled concept in the area of personal jurisdiction determinations. In a case raising liability issues, a California court will have personal jurisdiction over a successor company if (1) the court would have had personal jurisdiction over the predecessor, and (2) the successor company effectively assumed the subject liabilities of the predecessor. (See, e.g., *Ray, supra*, 19 Cal.3d 22, 31; *Sanders, supra*, 95 Cal.App.3d 779, 787; *Williams v. Bowman Livestock Equipment Co.* (10th Cir. 1991) 927 F.2d 1128, 1132; *City of Richmond, Va. v. Madison Management Group* (4th Cir. 1990) 918 F.2d 438, 455; 9 Witkin, Summary of Cal. Law (10th ed. 2005) Corporations, § 17, pp. 796–798.) CenterPoint does not challenge the abstract logic of that rule, but contends it is inapplicable here because the business separation plan expressly assigned it only the assets and liabilities of the regulated businesses (public utilities), none of which is involved in the current complaint.

■ The parties do not dispute the typical bases for successor liability. As set forth in *Ray, supra*, 19 Cal.3d 22, 28, a successor company has liability for a predecessor's actions if (1) the successor expressly or impliedly agrees to assume the subject liabilities (which has never been argued here respecting the unregulated businesses), (2) the transaction amounts to a consolidation or merger of the successor and the predecessor, (3) the successor is a mere continuation of the predecessor, or (4) the transfer of assets to the successor is for the fraudulent purpose of escaping liability for the predecessor's debts. (*Ibid.*) In this case, plaintiffs' position appears to be that CenterPoint has successor liability under the second or third (merger, de facto merger or continuation) bases.

As a threshold matter, we agree with the trial court that the fraudulent purpose basis for successor liability does not apply in this case, and plaintiffs do not appear to pursue this theory. Former Reliant's restructuring was not prompted by an attempt to avoid its obligations to creditors, but rather by a change in Texas state law, and it was extensively reviewed by state and federal regulators. Further, as noted by the trial court in its ruling, assumption of liabilities can constitute sufficient "consideration" for a legitimate transaction. (See *Beatrice, supra*, 6 Cal.4th 767, 778, 782–783.) Neither CenterPoint nor New Reliant was left undercapitalized because of the restructuring, and both could theoretically have responded to creditors.

■ The more significant questions arise under the second and third prongs of the test set forth in *Ray, supra*, 19 Cal.3d 22, 28, as to whether

CenterPoint was a "mere continuation of the seller," or if a de facto merger took place. To prevail on such a theory, plaintiff would have to demonstrate "(1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations. [Citations.]" (*Id.* at p. 29; see *Beatrice, supra*, 6 Cal.4th 767, 778.) However, it is not dispositive that some of the same persons may serve as officers or directors of the two corporations. The relevant inquiries are whether the two corporations have preserved their separate identities and whether recourse to the debtor corporation is available. (*Beatrice*, at p. 778.)

■ To constitute a valid reorganization that results in two separate entities, a corporate transaction must meet certain standards: "An asset acquisition can amount to a de facto merger. This may occur where the purchaser acquires *all* assets, including *choses in action*, and also assumes *all liabilities* of the seller; the purchaser continues to operate the business and the seller dissolves." (Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2007) ¶ 8:668, p. 8-88.7.) "The crucial factor in determining whether a corporate acquisition constitutes either a de facto merger or a mere continuation is the same: whether adequate cash consideration was paid for the predecessor corporation's assets." (*Franklin v. USX Corp.* (2001) 87 Cal.App.4th 615, 625 [105 Cal.Rptr.2d 11] (*Franklin*).)

■ In *Marks, supra*, 187 Cal.App.3d 1429, the trial court set out a checklist for determining whether a de facto merger had taken place that would render the successor company liable for the plaintiff's product liability claim: "(1) was the consideration paid for the assets solely stock of the purchaser or its parent; (2) did the purchaser continue the same enterprise after the sale; (3) did the shareholders of the seller become shareholders of the purchaser; (4) did the seller liquidate; and (5) did the buyer assume the liabilities necessary to carry on the business of the seller? [Citations.]" (*Id.* at p. 1436; see also *Franklin, supra*, 87 Cal.App.4th 615, 626.) Plaintiffs focus on the consideration factor here, arguing this transaction did not involve any significant supporting consideration. They also argue the reorganization took place over a long period of time, so there would be no surprise or unfairness in an exercise of jurisdiction over CenterPoint.

■ In *Beatrice*, a tax case, the Supreme Court analyzed the basic requirements for a valid agreement when one company assumes the liabilities of another: "If supported by consideration, it is enforceable notwithstanding the continuing primary liability of the promisee for the same obligation. It is a benefit to the promisee because the promisee may compel the promisor to perform, or, if the promisor does not do so, recover damages from the promisor in the amount or value of the obligations it is compelled to satisfy

as the primary obligor. This right to compel another to fulfill the promisee's obligations arises from the assumption agreement. That agreement therefore has value equal to the cost to the promisee of paying its debts or fulfilling its obligations. . . . [¶] Moreover, it is not necessary in this state that there be both a benefit to the transferor and a detriment to the transferee for consideration to be found. It is sufficient under Civil Code section 1605 that the transferee of assets suffer prejudice or agree to do so. [Citation.] . . . [T]he detriment to the party who agrees to assume the obligations of another alone may constitute consideration for the transfer of assets." (*Beatrice, supra,* 6 Cal.4th 767, 782–783.)

Before addressing these jurisdictional questions on their merits, we first agree with CenterPoint that it is appropriate to examine successor liability issues on their own unique facts. This is particularly true in this de novo review of a ruling on a motion to quash. In *Rego, supra,* 181 F.3d 396, 403, the appellate court analyzed a successor liability issue in the employment context, taking into account "the totality of the unusual circumstances," because "we emphasize that each successor liability 'case must be determined on its own facts' . . . . [Citation.]" Considerations of fairness and equity apply. (*Id.* at p. 401.) California cases following *Ray, supra,* 19 Cal.3d 22, have also taken into account equitable risk spreading doctrines, since the issues in *Ray* arose in a products liability context. (See *Rosales v. Thermex-Thermatron, Inc.* (1998) 67 Cal.App.4th 187, 196 [78 Cal.Rptr.2d 861] [determination whether to impose successor liability involves broad equitable considerations and thus is for court (not jury) to decide]; *Ray, supra,* 19 Cal.3d 22, 31–33; Friedman, Cal. Practice Guide: Corporations, *supra,* ¶ 8:663, pp. 8-88.5 to 8-88.6.) Although this is not a products liability case, equitable principles still apply to successor liability issues in a jurisdictional context.

We apply the above rules in part IIIB., *post.* First, however, we outline the effect on this case of the ruling on the same record regarding general jurisdiction (agency) over Former Reliant/New Reliant, as addressed in the companion case opinion, regarding the unregulated businesses.

### III

### *ANALYSIS OF THEORIES OF PERSONAL JURISDICTION*

#### A. *Companion Case Opinion Conclusions*

With regard to the proper standard of review, the trial court's agency finding in the companion case opinion is analyzed under a substantial evidence standard. There, the jurisdictional facts are conflicting with regard to

the general jurisdiction issue of whether RES was acting as an agent that was subject to the significant operational control and supervision of New Reliant. The key allegations of excessive control or oversight concerned the relationship of New Reliant to RES day-to-day business practices, particularly as affected by the reporting requirements—SAR, DPR, etc.—regarding the activities of RES in conducting daily gas trading on the spot market. (See fn. 6, *ante*.) On those issues, the trial court permissibly drew inferences from the respective showings by the parties (New Reliant and plaintiffs), and in the companion case opinion, we uphold the trial court's ruling that the motion to quash was denied based on sufficient minimum contacts of Former Reliant/RRI/New Reliant, RES and California.

In distinguishing the issues regarding CenterPoint that are currently before us, it must be emphasized that those separate general jurisdiction determinations about the relationship between Former Reliant/RRI/New Reliant and RES were based upon disputed evidence regarding the operation of the unregulated businesses that are the subject of this complaint. Here, in contrast, we are dealing with CenterPoint's assumption of liabilities of the regulated businesses. Logically, it is not dispositive on issues of regulated businesses whether RES was treated as an agent during the relevant time periods by New Reliant regarding its unregulated businesses.

Rather, the documentary evidence showed that CenterPoint succeeded to the assets and liabilities of the regulated businesses that had been previously owned by Former Reliant, and there was no dispute on that issue. This presents a pure question of law regarding the interpretation of the documents and the application of jurisdictional and equitable standards, in this successor liability context. Plaintiffs cannot appropriately contend that CenterPoint is subject to general jurisdiction under theories of agency and/or the "representative services doctrine," due solely to its history of evolving from Former Reliant's organization. (See *Aquila, supra*, 148 Cal.App.4th at pp. 576–577.) The only showing made by plaintiffs that would support such a minimum contacts finding concerned the operation of the unregulated businesses in California, such as New Reliant's activities.

Based on the principles outlined above, such as *Rego, supra*, 181 F.3d 396, regarding the need to analyze each successor liability question on its own unique facts, we are satisfied that the issues addressed regarding New Reliant in the companion case are materially different, regarding agency, which represents another subset of these facts. Here, we resolve, for jurisdictional purposes, whether CenterPoint could and did legitimately reach a contractual arrangement with its predecessor to assume the liabilities of the regulated businesses only. If so, no further consideration need be given to the agency or "representative services doctrine" on the current record, regarding

CenterPoint, due to the different underlying facts about the portion of the businesses that it inherited. (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 543 [99 Cal.Rptr.2d 824].)

Moreover, in the companion case opinion, we rejected plaintiffs' contentions that a sufficient basis for specific jurisdiction over New Reliant existed because its predecessor, Former Reliant, had purposefully availed itself of opportunities in the State of California, again with regard to the unregulated businesses. (*Vons, supra*, 14 Cal.4th 434, 445–446.) If the corporate restructuring record is accurate and sufficiently shows the separation of the two types of businesses, we need not engage in any such analysis here. Instead, the remaining issue is whether the trial court drew the correct legal conclusions from the essential undisputed facts in the record regarding the corporate restructuring and consequent successor liability of CenterPoint.

### B.  *Successor Jurisdiction Analysis*

With this background, we can examine the jurisdictional facts arising from the 2000–2002 corporate reorganization of Former Reliant, including the evolution of CenterPoint from a subsidiary into a parent and an independent company. The trial court correctly framed the issue as whether two concurrent successor companies and the predecessor can legitimately agree that each will assume only certain aspects of the predecessor's liabilities. The trial court agreed with CenterPoint that it was not a "mere continuation" of the predecessor. (*Ray, supra*, 19 Cal.3d at p. 28.) The court also observed that the general test for a de facto merger was not met, but it nevertheless relied on the November 2001 shareholder communication, the "Proposed Holding Company Formation, Notice to Shareholders," as showing CenterPoint's predecessor used the term "merger agreement" when discussing the proposed changes in the relationship between Former Reliant and CenterPoint, and concluded that this was extremely "telling" of its intentions.

On the entire record, we cannot find the trial court drew the correct conclusions in denying CenterPoint's motion to quash. The court first recognized that consideration had legitimately been given for that corporate reorganization, by CenterPoint's assuming certain liabilities of the predecessor, in a significant amount ($4.7 billion). (*Beatrice, supra*, 6 Cal.4th 767, 782–783.) The court showed a good understanding of the differences in the various types of businesses and liabilities assumed by the two successor companies and the reasons for those. As argued by CenterPoint to the trial court, CenterPoint divested itself of benefits as well as liabilities of the unregulated businesses. However, by going on to rule that the shareholders' document "de facto merger" language was dispositive, the trial court incorrectly disregarded all of the other key portions of the transaction. By the time of completion of the corporate restructuring (Oct. 2002), Former Reliant had

already transferred its unregulated businesses to New Reliant (Jan. 2001). In November of 2001, any merger from Former Reliant into CenterPoint could no longer contain any assets or liabilities of the unregulated businesses that were no longer owned. Accordingly, the transaction as a whole between CenterPoint and Former Reliant could not have caused CenterPoint to become the *successor* to the unregulated businesses. Although the corporate reorganization did cause CenterPoint to become New Reliant's *parent* for approximately one month, plaintiffs do not argue that there is personal jurisdiction over CenterPoint for this temporary role.[8]

■ Moreover, there has been no showing of anything improper in the specific reorganization transaction that took place, in response to government regulations, with regard to these particular transfers of liabilities. In *Franklin, supra*, 87 Cal.App.4th 615, the court observed that one of the important policies promoted by corporate law is predictability and foreseeability in these major economic decisions: "Unforeseeable alterations in successor liability principles complicate transfers and necessarily increase transaction costs. [Citations.]" (*Id.* at p. 625.) On their face, these transactions sought to set out an orderly method of allocating assets and liabilities, in response to government regulation, and to optimize the positions of each successor company. In *Beatrice, supra*, 6 Cal.4th 767, 778, the Supreme Court acknowledged that liability should not be imposed on an acquiring corporation where the two corporations have separate identities, have distributed liabilities accordingly, and recourse to the debtor corporation remains available. CenterPoint substantially showed its separate identity with regard to the specific jurisdictional allegations in this complaint. We should not disturb this corporate set of expectations, absent a clearer showing that one of the exceptions to successor nonliability must apply.

■ In conclusion, since CenterPoint is not a successor to the unregulated businesses, it cannot properly be subject to jurisdiction on a successor liability theory as to their activities, as alleged in the complaints. Moreover, the existence of general jurisdiction over New Reliant, based upon an agency theory arising from its relationship with its California subsidiary in the unregulated business operations, does not supply any basis to find CenterPoint subject to California jurisdiction. Absent a recognized basis for successor liability, the trial court does not have successor jurisdiction over CenterPoint and should have granted CenterPoint's motion to quash.

---

[8] In order to show jurisdiction based on that one-month period, plaintiffs would essentially have to establish that CenterPoint, as parent, was directly involved in the management of both New Reliant and the subsidiary RES. They do not attempt to do so and the record would not support any such conclusion.

## DISPOSITION

Let a peremptory writ of mandate issue directing the trial court to vacate its order denying the motion of CenterPoint to quash service of summons and to enter a new order granting the motion. CenterPoint is awarded its costs incurred in this original proceeding.

McConnell, P. J., and Benke, J., concurred.