Filed 6/13/14  BRS-Tustin Safeguard Assoc. v. Itherx Pharma, Inc. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BRS-TUSTIN SAFEGUARD ASSOCIATES II, LLC,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ITHERX PHARMA, INC.,<br><br>    Defendant and Appellant. | D064037<br><br><br><br>(Super. Ct. No. 37-2010-00098889-CU-BC-CTL ) |

APPEAL from a judgment of the Superior Court of San Diego County, Randa Trapp, Judge.  Affirmed.

Law Office of Paul H. Samuels and Paul H. Samuels for Defendant and Appellant.

Catalano & Catalano, Patrick E. Catalano and Mark Adams Poppett for Plaintiff and Respondent.

ITherX Pharma, Inc. (Pharma) appeals an amended judgment that added it as a judgment debtor in favor of BRS-Tustin Safeguard Associates II, LLC (BRS) because the superior court found Pharma is a continuation of the original judgment debtor iTherX Pharmaceuticals, Inc. (iTherX).  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On March 21, 2000 BRS-Tustin Safeguard Associates, L.P. (Safeguard), as lessor, and Immusol, Inc. as lessee, executed a written lease for certain real property commonly known as 10792 Rosell Street, San Diego, California (Premises) for a term through May 31, 2008. Immusol then took possession of the Premises and began operating its business there. Immusol researched and developed new pharmaceuticals.

On September 15, 2000, Safeguard transferred commercial property, including the Premises, to BRS. BRS became the lessor under the lease. Immusol and BRS subsequently negotiated a lease amendment, resulting in a three-year extension of the lease term. In addition, BRS agreed to reduce Immusol's rent 25 percent from January 1, 2008 through June 30, 2008 and pay $60,000 toward tenant improvements on the Premises.

In late November 2007, Immosul amended its articles of incorporation to reflect its name change to iTherX.

Although BRS honored the amendments to the lease by temporarily reducing the rent and contributing $60,000 toward tenant improvements, iTherX did not pay the rent due for June 2009. Notices to pay rent or quit were served, and BRS eventually regained possession in September 2009, but was unable to rent the premises until April 1, 2011.

ITherX experienced financial difficulties when its key drug failed to perform as expected in clinical testing. However, for $75,000, iTherX purchased the patents for other drugs that it planned to adapt to treat hepatitis C. Yet, iTherX did not have sufficient funds to complete clinical testing of these newly acquired drugs. As such,

2

iTherX sought additional funding. After many unsuccessful attempts, it finally obtained funding from a group of private investors who were willing to loan iTherX up to $3 million to fund its "scaled down operations and further testing of the remaining drug compounds."

The loan was memorialized in a contract entitled "Note Purchase Agreement" (note), which was dated February 19, 2010. The note referred to the investors as "purchasers," listing a total of 19 purchasers. Of these purchasers, Easton iTherX, LLC[1] (Easton) contributed the most funds and Calmedica, LLC contributed the second most funds. ITherX's chairman of the board, Frank Litvack, was a principal of Calmedica. Three shareholders of iTherX were included among the 19 purchasers listed in the note. The note also acknowledged a debt of about $1,077,537.24 iTherX owed BRS under the lease.

In exchange for the loan, the 19 purchasers were given a security interest in all of iTherX's assets, including the patents for the drugs it planned to develop for the treatment of hepatitis C. Under the note and related agreements, iTherX was to achieve certain benchmarks (e.g., enter into a definitive agreement by the end of the first calendar quarter with the National Institute of Health (NIH) or National Institute of Allergy and Infectious

---

[1] The record mentions two companies containing the name Easton: Easton iTherX, LLC and Eastern Capital, LLC. Pharma refers to Easton Capital and BRS refers to Easton iTherX. Based on our review of the record, both names refer to the same company. Indeed, BRS argues they are the same company and Easton iTherX is the correct name of the company. Pharma does not address the issue.

Diseases for the start of a clinical trial no later than the end of the calendar quarter of 2010).

ITherX ultimately borrowed about $2.8 million under the note. It did not use any of the newly acquired funds to pay BRS what it owed under the lease. Much of the money iTherX borrowed went to the payment of its chief executive officer's (Jeffrey McKelvy) and his wife's (Flossie Wong-Staal) respective salaries for 11 months in 2010 and nine months in 2011 with McKelvy receiving an annual salary of $350,000 and Wong-Stall receiving an annual salary of $250,000.[2] In addition, Easton, which was represented on iTherX's board by John Friedman, controlled the loan funds and had to approve any withdrawal or use of funds. The funds also were used for the development of the subject drugs.

On August 25, 2010, BRS filed suit for breach of contract against iTherX based on iTherX's failure to pay rent under the lease. On March 4, 2011, the superior court issued a right to attach order and order for issuance of writ of attachment of iTherX's property in the amount of $1,067,727.

On April 21, 2011, a UCC financing statement related to the loan was filed.[3]

---

[2] At that time, iTherX had no other employees. Apparently, the rest of iTherX's employees were terminated near in time to the company receiving the loan.

[3] Pharma offers no explanation why the UCC financing statement was filed over a year after the loan was made.

In August 2011, Friedman, on behalf of Easton, sent a letter to McKelvy declaring the loan in default as of May 30, 2010--only three months after financing was obtained. The letter demanded payment of the entire principal of the loan.

On August 19, 2011, a certificate of incorporation for Pharma was filed with the Delaware Secretary of State. The purchasers (including Easton) created Pharma for the purpose of taking title to iTherX's assets.

In late August or early September 2011, iTherX and the purchasers executed a document entitled "Notice of and Consent to Acceptance of Collateral." In that document, iTherX acknowledged that it had defaulted on the loan and the purchasers accepted iTherX's assets as collateral in "full satisfaction" of the obligations owed by iTherX under the note. McKelvy signed the document on behalf of iTherX and as one of the purchasers.

Through a series of transactions, iTherX assigned its assets to Pharma. These included its patents in the drugs that were to be the subject of future clinical trials, a clinical trial agreement, and $700,000 of the money originally loaned to iTherX. The transfer of the $700,000 was accomplished by changing the name of the subject bank account from iTherX to Pharma. The transactions were memorialized in three documents, all of which have McKelvy signing on behalf of both iTherX and Pharma. In addition, the documents memorializing the transfer of iTherX's assets contained the same effective date (September 8, 2011) as the notice and consent to acceptance of collateral.

The trial in the instant matter occurred on September 12, 2011. ITherX did not attend trial. That same day, the superior court entered judgment in favor of BRS against

5

iTherX in the amount of $1,373,560.21. Nine days later, Pharma filed certain documents with the California Secretary of State indicating it was an active Delaware corporation operating in California with the same mailing address as iTherX.

The record indicates and Pharma does not dispute that by November 2011, it had received significant additional funding (in excess of $3 million) to continue with the same drug clinical trials for which iTherX had obtained the loan.

In early 2012, BRS took a debtor examination of McKelvy, the person most knowledgeable of iTherX. Among other testimony, McKelvy testified to the following: (1) after the September 2011 transfer of assets from iTherX to Pharma, iTherX had no assets; (2) the transfer of assets to Pharma was made by the lienholder (Easton) whose principal (Friedman) was a director of iTherX; (3) Pharma had a very similar name to iTherX, possessed all of iTherX's assets, and continued to conduct the same clinical trials of the same drugs previously begun by iTherX; (4) although the NIH was funding the trials, it was not notified why Pharma took over the trials; (5) McKelvy, who was the chief executive officer of iTherX, became the president of Pharma; (6) several former board members of iTherX became board members of Pharma; (7) Friedman, a board member of iTherX and principal of Easton, became the treasurer of Pharma; (8) Wong-Stall, who was chief scientist of iTherX, became the chief scientist of Pharma; (9) Pharma operated under a manufacturing contract signed by iTherX without any modification of the contract (i.e., it did not make itself a party to the agreement); and (10) Pharma made no attempt to sell the patents it acquired from iTherX.

6

Based on these newly discovered facts, BRS moved under Code of Civil Procedure[4] section 187 to amend the judgment to add Pharma as a judgment debtor because Pharma was the alter ego of iTherX, Pharma was liable as the successor to iTherX, and there was a fraudulent transfer from iTherX to Pharma. Pharma opposed the motion.

During oral argument, the superior court indicated, multiple times, it doubted the sincerity of both the loan and the purchasers:

> "What about the fact that the -- I think that's in my -- that the conditions of the loan, that it was basically set up for failure.

> "It [the loan] kind of seems like a sham.

> "What about the timing of not calling that loan until, you know, this complaint is filed and trial is getting ready to start?"

Pharma attempted to address these concerns, but ultimately proved unsuccessful. The court granted the motion to amend the judgment and issued a detailed minute order explaining its reasoning. It found Pharma was a "mere continuation" of iTherX. It determined there was a lack of consideration for Pharma's acquisition of iTherX's assets and one or more individuals were officers, directors, or shareholders of both iTherX and Pharma. The superior court subsequently amended the judgment to include Pharma as a judgment debtor.

Pharma timely appealed.

---

4       Statutory references are to the Code of Civil Procedure unless otherwise specified.

DISCUSSION

Section 187 permits a court, in appropriate cases, to amend a judgment to add additional judgment debtors.[5] (*Hall, Goodhue, Haisley & Barker, Inc. v. Marconi Conf. Center Bd.* (1996) 41 Cal.App.4th 1551, 1554-1555 (*Hall*); *Dow Jones Co. v. Avenel* (1984) 151 Cal.App.3d 144, 148.) The general rule is that a court has authority to amend its judgment at any time in order that the judgment will properly designate the real defendants. (*Id.* at p. 149.) Judgments typically are amended to add additional judgment debtors on the ground that a person or entity is the alter ego of the original judgment debtor (*Hall*, *supra*, at p. 1555) or that the person or entity is a successor corporation (*McClellan v. Northridge Park Townhome Owners Assn.* (2001) 89 Cal.App.4th 746, 753 (*McClellan*)).

The trial court's decision to amend a judgment to add a judgment debtor is reviewed for an abuse of discretion. (See *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 508.) Factual findings necessary to the court's decision are reviewed to determine whether they are supported by substantial evidence. (*McClellan*, *supra*, 89 Cal.App.4th at pp. 751-752; *Wollersheim v. Church of Scientology* (1999) 69 Cal.App.4th 1012, 1014-1015.)

---

5       Section 187 provides: "When jurisdiction is . . . conferred on a Court . . . , all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code."

Here, Pharma challenges the superior court's finding that it is the successor corporation to iTherX, and thus, a mere continuation of iTherX. In other words, Pharma contends the court's findings are not supported by substantial evidence. " 'Evidence is substantial if any reasonable trier of fact could have considered it reasonable, credible, and of solid value.' " (*Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 52.) In making that determination, we must resolve all evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the superior court's decision. (*Valiyee v. Department of Motor Vehicles* (1999) 74 Cal.App.4th 1026, 1031; *Kazensky*, *supra*, at p. 52.)

"[A] successor company has liability for a predecessor's actions if (1) the successor expressly or impliedly agrees to assume the subject liabilities . . . , (2) the transaction amounts to a consolidation or merger of the successor and the predecessor, (3) the successor is a mere continuation of the predecessor, or (4) the transfer of assets to the successor is for the fraudulent purpose of escaping liability for the predecessor's debts." (*CenterPoint Energy, Inc. v. Superior Court* (2007) 157 Cal.App.4th 1101, 1120 (*CenterPoint*); see also *Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28 (*Ray*).)

" 'Corporations cannot escape liability by a mere change of name or a shift of assets when and where *it is shown that the new corporation is, in reality, but a continuation of the old*. Especially is this well settled when actual fraud or the rights of creditors are involved, under which circumstances the courts uniformly hold the new corporation liable for the debts of the former corporation.' " (*McClellan*, *supra*, 89 Cal.App.4th at p. 754, italics in original.) "California decisions holding that a

9

corporation acquiring the assets of another corporation is the latter's mere continuation and therefore liable for its debts have imposed such liability only upon a showing of one or both of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations." (*Ray*, *supra*, 19 Cal.3d at p. 29.)

The superior court must determine successor liability based on the totality of the unique circumstances and apply considerations of fairness and equity. (*CenterPoint*, *supra*, 157 Cal.App.4th at p. 1122.)

Here, we are satisfied that substantial evidence supports the court's finding Pharma was a mere continuation of iTherX. First, it is undisputed that the two companies shared key personnel. McKelvy was the CEO of iTherX and the president of Pharma. Wong-Staal was the chief scientist for both companies. Several of the directors of iTherX became directors of Pharma. Pharma points out that iTherX had over 100 shareholders and the vast majority of them had no interest in Pharma. This argument goes to the weight of the evidence. However, we cannot reweigh the evidence. (See *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 766; *Leff v. Gunter* (1983) 33 Cal.3d 508, 518.) In any event, the fact that many shareholders of iTherX did not have an interest in Pharma does not diminish the evidence that the two companies shared officers and directors.

Pharma also contends that the superior court's finding of inadequate consideration "is nonsensical and turns logic on its head." It bases this argument on the fact that Easton and the other purchasers loaned Pharma about $2.8 million. Pharma's argument,

however, overlooks the substantial evidence supporting the reasonable inference underlying the court's finding of inadequate consideration that the loan was a "sham" and "set up for failure." For example, in exchange for the loan, the purchasers had a security interest in all of iTherX's assets. ITherX failed to achieve its first bench mark within three months of receiving the funds. Easton and the investors waited over a year to file the UCC financing statement. Easton called the loan right before trial although iTherX had been in default for over a year. Pharma was created shortly before trial for the sole purpose of taking title to all of iTherX's assets. After receiving iTherX's assets, Pharma continued iTherX's business, using infrastructure established by iTherX to engage in clinical trials to develop the drugs acquired from iTherX. In doing so, Pharma assumed iTherX's contracts and obtained additional funding for clinical testing. In this sense, Pharma is almost indistinguishable from iTherX. Indeed, there is evidence in the record that Pharma had the same mailing address as iTherX and received $700,000 of the money originally loaned to iTherX. On this record, it is reasonably inferred that the $2.8 million was not a loan to iTherX, but simply an investment by the purchasers in Pharma as well as a vehicle that allowed iTherX (with a name change) to develop its drugs without the burden of paying its debt owed to BRS. Pharma is continuing iTherX's work and clearly benefitted from the money "loaned" to iTherX, which was spent on salaries and efforts to begin clinical trials of the subject drugs.

Pharma attempts to explain away some of the evidence. It argues that it waited to declare iTherX in default under the loan to provide iTherX with more time to achieve the required benchmarks. Again, this argument goes to the weight of the evidence and

11

involves a credibility determination. As such, we do not consider it on appeal. (See *Reichardt v. Hoffman*, *supra*, 52 Cal.App.4th at p. 766; *Leff v. Gunter*, *supra*, 33 Cal.3d at p. 518.) In addition, "[t]he fact that it is possible to draw some inference other than that drawn by the trier of fact is of no consequence." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) Moreover, there is no evidence in the record showing how iTherX used this additional time.

Additionally, Pharma argues that $2.8 million is "a lot of money for a sham." We do not quibble with Pharma's characterization of the amount of money, but it can be reasonably inferred on the record that Pharma received most, if not all, of the benefit of the $2.8 million. It received $700,000 of that money and is continuing iTherX's clinical trials under iTherX's contracts. The purpose of the loan was to provide iTherX with funds necessary to conduct the clinical trials of the subject drugs. This is precisely what Pharma is doing after the transfer of iTherX's assets.

It was the totality of all the evidence before it that persuaded the superior court that Pharma was merely the continuation of iTherX and that no adequate consideration was given for the transfer of all of the assets of iTherX to Pharma. The court did not err in reaching this conclusion.

DISPOSITION

The amended judgment, including Pharma as an additional judgment debtor, is affirmed.  BRS is to recover costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


McDONALD, J.


McINTYRE, J.